In the

# United States Court of Appeals

### For the Seventh Circuit

———————————

No. 23-1463

NATHANIEL PRYOR,

*Plaintiff-Appellant,*

*v.*

MICHAEL CORRIGAN, et al.,

*Defendants-Appellees.*

———————————

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 1:17-cv-01968 — **Steven C. Seeger**, *Judge.*

———————————

ARGUED FEBRUARY 5, 2024 — DECIDED DECEMBER 23, 2024

———————————

Before ROVNER, BRENNAN, and KIRSCH, *Circuit Judges.*

BRENNAN, *Circuit Judge.* After receiving a tip about drug activity linked to a van in a specific area of Aurora, Illinois, officers pulled over a vehicle that fit the description. Once the van stopped, Nathaniel Pryor and another man exited quickly. An officer yelled to Pryor to get on the ground, ran to him, took him down, struck him twice, and later searched him. Although officers determined that Pryor was not

involved with drug activity, the state charged him with ob-structing/resisting a police officer. The state later dropped the charge.

Pryor sued several officers and the City of Aurora. He brought multiple federal and state law claims, including under 42 U.S.C. § 1983. The district court granted in part defendants' motion for summary judgment. The remaining claims went to trial, at which the jury found for the defendants. Pryor appeals, claiming the district court erred in its summary judgment decision and in many evidentiary and procedural rulings at trial.

The district court did not err in granting defendants summary judgment on Pryor's false arrest claim and qualified immunity on part of his excessive force claim. And Corrigan's two searches were proper incident to Pryor's arrest. The district court also did not abuse its discretion in its trial decisions. So, we affirm the district court in full.

## I. Background

### A. Factual

On March 23, 2015, Aurora police received a tip from a confidential informant that someone would be "cooking crack cocaine at a home on Kane Street," and "would be in a conversion van." Five police officers joined a stakeout of that location. Officer Damien Cantona and another officer surveilled the home from a distance in their vehicle. Officer Michael Corrigan and another officer cruised the neighborhood. Officer Nathaniel Isaak parked further down Kane Street with directions, if probable cause existed, to stop the van.

Later that evening, a conversion van drove into the neighborhood. Pryor sat in the front passenger seat and the man

named in the tip sat in the back seat. They were headed to Pryor's house to grab his gym bag and then to "go to the gym for a workout."

Isaak was the first officer to see the van. He watched it approach the intersection of Kane and Ohio Streets, stop at a stop sign, signal, and then turn right. But the van failed to signal 100 feet before turning, a violation of Illinois law. Isaak decided to stop the van, so he began to follow it. Corrigan followed Isaak's squad car in their cruiser, trailing by a few blocks.

Corrigan's and Isaak's police car dash cameras captured this sequence, the ensuing traffic stop, and the events that followed. The two dashcams recorded video and audio, some of which overlapped. Corrigan's camera showed Pryor's initial actions after the traffic stop. Isaak's camera captured the beginning of the interaction between Pryor and Corrigan, and Corrigan's camera showed the end.

The parties characterize what took place differently, but the videos tell their own story. On appeal, we "view the facts and draw reasonable inferences in the light most favorable to the party opposing the summary judgment motion." *Scott v. Harris*, 550 U.S. 372, 378 (2007) (cleaned up). But when parties tell two different stories, "one of which is blatantly contradicted by the record," we "should not adopt that version of the facts… ." *Id.* at 380. And "[w]hen video 'firmly settles a factual issue,' we will not 'indulge stories clearly contradicted by the footage' because there is no genuine factual dispute." *Smith v. Finkley*, 10 F.4th 725, 730 (7th Cir. 2021) (citing *Horton v. Pobjecky*, 883 F.3d 941, 944 (7th Cir. 2018)). The district court found that certain parts of the videos are susceptible to different interpretations (creating an issue of fact) or were unclear.

But most of the video depictions were clear. There is no suggestion that the recordings are unreliable or inauthentic.

The dashcam from Isaak's squad car shows him following the van for about 20 seconds over two blocks before pulling it over. The driver of the van hit the brakes, activated his turn signal, and within a few seconds pulled into a driveway. Isaak parked his squad car in front of the house just before the driveway.

As soon as the van parked, the man in the back seat exited the vehicle and took off running. Isaak then called into his radio, "I got—I got a male bailing out of the house! 1123 Fenton." Isaak ran toward the van and then pursued the fleeing man, yelling, "Get on the ground! Get on the ground now! Get on the ground!"

At the same time, Corrigan's squad car approached the scene. That car's dashcam recorded Pryor exiting the van, shutting the passenger door, and moving down the driveway toward the street. Pryor did not run, but he did not walk either. His feet moved quickly, yet he did not cover much ground, taking about 12 steps in roughly four seconds.

As Pryor reached the end of the driveway, Corrigan and Christoffel pulled in behind Isaak's vehicle. One officer yelled, "Go" five times, and "He's out, he's out! He's running, he's running!" Pryor slowed to a stop where the driveway met the street, directly in front of the hood of Isaak's squad car. He faced the squad cars and raised both hands, which were empty, in the air. He stood still for a few seconds, looking at the officers. Corrigan twice yelled for Pryor to "Get on the ground!" Then, Corrigan ran toward Pryor. Pryor claims that

Corrigan had his gun drawn, but if so, this was outside of the dashcam view.

Corrigan approached Pryor, who was a much larger man, from the front. Corrigan later testified that because Pryor had not been searched and was larger than him, Corrigan feared Pryor was going to gain control over the situation and harm him.

Corrigan ran behind Pryor and put both arms around his midsection. Corrigan then used his right leg to sweep Pryor's left leg, taking him to the ground, and then tackled him. Pryor claims he was not given time to get on the ground, he did not resist Corrigan, and Corrigan did not tell him he was under arrest or why he was being arrested.

Pryor landed on his side in the snow-spotted pavement. He was face down with Corrigan straddling him. Pryor says he hit his head on the cement, making him woozy. Pryor then asked, "what's going on?" Corrigan yelled, "don't fight, stop fighting!" Pryor responded, "I'm not fighting." Corrigan ordered Pryor to put his hands behind his back. Pryor asked, "Sir, what is the problem?" The video shows that Pryor may not have put his hands behind his back right away. Pryor repeated, "what is the problem?"

Corrigan then raised his right arm and hit Pryor. The video does not show where the blow landed, but Pryor says it was on his head. Corrigan once again commanded Pryor to put his hands behind his back. Pryor repeatedly asked, "Sir, what is the problem?" Corrigan told Pryor "don't move."

Meanwhile, Corrigan reached for his handcuffs, grabbed Pryor's arms, and placed him in the restraints. This took about 30 seconds. While handcuffing Pryor, Corrigan struck him a

second time. The video does not make clear if Pryor was fully handcuffed during the second strike. The officer continued to yell "stop fighting" and "don't move!" Corrigan then stood up, and Pryor laid on the ground in handcuffs, asking to get up.

About a minute later, Corrigan asked, "Why didn't you get on the ground when I told you to get on the ground?" Pryor responded, "I had got my hands up! You didn't see me with my hands up?" After some back and forth, Corrigan said, "When the police stop a car, and you get out and run from it, that's a problem." He added, "The crazy part is, when you normally get stopped by the police, you don't run from the car. That's the crazy part."

Corrigan searched Pryor while he laid on the pavement. Pryor wore black jeans over a pair of sweatpants. Under the sweatpants were basketball shorts and then underwear. Corrigan later helped Pryor to his feet and searched him a second time. The dashcam videos do not show the details of Corrigan's searches.

Eventually, the police put Pryor into a transport vehicle and took him to the police station. Pryor testified that, while he sat in the back of the vehicle, Cantona searched him a third time. Cantona denied this search happened, and the alleged third search was not captured on video. Pryor testified, and the officers denied, that Corrigan and Cantona inappropriately touched Pryor during their respective searches of him. Those searches uncovered no contraband. The officers found no contraband in the conversion van or in the area where the other passenger had fled the scene.

**B. Procedural**

Pryor was charged with "obstructing/resisting a police officer in violation of 720 ILCS 5/31-1." He was not charged with any other crime, and the state eventually dismissed the charge.

Pryor filed suit against Corrigan, Cantona, several other officers, and the City of Aurora. He brought six claims: three under federal law, 42 U.S.C. § 1983—false arrest, excessive force, and illegal search; one under both federal and state law—malicious prosecution; and two under state law alone—battery and indemnification.

The parties cross-moved for summary judgment. The district court denied Pryor's motion in its entirety and granted in part and denied in part defendants' motion. In a lengthy and detailed order, the court dismissed the false arrest and malicious prosecution claims in their entirety; dismissed part of the excessive force, illegal search, and battery claims; and dismissed all defendants except Corrigan and Cantona. Three claims survived for trial: (1) the excessive force claims under § 1983 against Corrigan for the two punches; (2) the illegal search claims under § 1983 against Cantona for the third search; and (3) the state law battery claims against Corrigan, Cantona, and the City of Aurora.

Before trial, the parties filed nearly forty motions *in limine* and raised multiple evidentiary disputes. The district court issued two thorough sets of orders and rulings resolving these challenges. During trial, Pryor filed largely duplicative motions on which the court also ruled. A four-day trial took place in February 2023, and the jury found defendants not liable on all remaining claims.

On appeal, Pryor claims the district court erred in granting defendants summary judgment on his three § 1983 claims—false arrest, excessive force, and illegal search.[1] Pryor also challenges five of the district court's evidentiary and procedural rulings for trial.

## II. Summary Judgment

We review de novo a trial court's summary judgment ruling. *Turubchuk v. S. Ill. Asphalt Co., Inc.*, 958 F.3d 541, 548 (7th Cir. 2020). Summary judgment is appropriate when there is no dispute of material fact, and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a); *Brown v. Osmundson*, 38 F.4th 545, 549 (7th Cir. 2022). The same principles apply when parties file cross-motions for summary judgment. We treat each cross-motion "separately in determining whether judgment should be entered in accordance with Rule 56." *Marcatante v. City of Chicago*, 657 F.3d 433, 439 (7th Cir. 2011).

Pryor claims the district court erred in granting defendants summary judgment on his false arrest, excessive force, and illegal search claims. We discuss each in turn.

### A. False Arrest

Pryor was arrested and charged with "obstructing/resisting a police officer in violation of 720 ILCS 5/31-1." He claims

---

[1] Pryor mentions his malicious prosecution claim in his opening brief, but he does not explicitly address it, except to conclude without analysis that he is entitled to summary judgment. Absent more discussion, Pryor waives this argument on appeal. *See Bradley v. Village of University Park*, 59 F.4th 887, 897 (7th Cir. 2023).

Corrigan could not arrest him on this charge, so he was falsely arrested.

Probable cause is an absolute defense to a false arrest claim, and we analyze it objectively. *Abbott v. Sangamon County*, 705 F.3d 706, 713 (7th Cir. 2013). Probable cause exists if the "totality of the facts and circumstances known to the officer at the time of the arrest would warrant a reasonable, prudent person in believing that the arrestee had committed, was committing, or was about to commit a crime." *Id.* at 714. Only a probability or substantial chance of criminal activity is required, not an actual showing of such activity. *See United States v. Carroll*, 750 F.3d 700, 706 (7th Cir. 2014).

*Obstruction of Justice.* 720 ILCS 5/31-1 prohibits a person from knowingly "obstruct[ing] the performance by one known to the person to be a peace officer… ." 720 ILCS 5/31-1. As the dashcam videos showed, after the traffic stop Pryor exited the van, shut the passenger door, and moved down the driveway toward the street. Pryor traveled quickly, but he did not cover a lot of ground—taking about 12 steps in roughly four seconds. As Pryor reached the end of the driveway, Corrigan arrived at the scene. Observing Pryor leave the van and head south away from him and the other officers, Corrigan yelled for Pryor to "Get on the ground!"

Pryor argues that Corrigan did not have probable cause to arrest him for obstruction of justice. His argument rests on Corrigan's discovery response to one of Pryor's requests to admit, which stated:

> The individual defendant responding to this Request to Admit is not claiming that he/she had probable cause to arrest NATHANIEL PRYOR

> on March 23, 2015, for any charge other than re-
> sisting arrest.

> RESPONSE: Officer Corrigan admits.

Pryor contends that Corrigan's response is a judicial admission that there was not probable cause to arrest Pryor for any crime other than resisting arrest. Accordingly, no probable cause existed for an underlying offense, such as obstruction of justice by leaving a lawful traffic stop.

But Pryor misunderstands the impact of Corrigan's discovery response. Probable cause is an objective standard. Corrigan's subjective understanding of probable cause is irrelevant to the objective existence of probable cause. *See Devenpeck v. Alford*, 543 U.S. 146, 153 (2004) ("[An officer's] subjective reason for making the arrest need not be the criminal offense as to which the known facts provide probable cause."). As the Supreme Court has explained, "the fact that the officer does not have the state of mind which is hypothecated by the reasons which provide the legal justification for the officer's action does not invalidate the action taken as long as the circumstances, viewed objectively, justify that action." *Id.*

Instead, the court must view all facts from the standpoint of an "objectively reasonable police officer" and determine, based on those facts, whether probable cause existed. *District of Columbia v. Wesby*, 583 U.S. 48, 57 (2018); *see also Washington v. City of Chicago*, 98 F.4th 860, 875 (7th Cir. 2024) ("Probable cause is 'assessed objectively based on 'the conclusions that the … officer reasonably might have drawn from the information known to him.'" (citing *Young v. City of Chicago*, 987 F.3d 641, 644 (2021))). So, even if Corrigan's response were an

admission, probable cause could have supported Corrigan's decision to arrest Pryor for obstruction of justice.

Considering the totality of the evidence, a reasonable officer in Corrigan's position could have concluded that Pryor was leaving a lawful traffic stop. When a passenger does so, an officer has probable cause to arrest for resisting or obstructing a police officer. *See People v. Johnson*, 945 N.E.2d 2, 14–15 (Ill. App. Ct. 2010) (defendant, a passenger in vehicle lawfully stopped for traffic infraction, attempted to evade police by running from vehicle; officers had probable cause to arrest him for obstruction under Illinois law). Corrigan thus had probable cause to arrest and charge Pryor with obstruction of justice under 720 ILCS 5/31-1. The district court did not err, therefore, in granting Corrigan summary judgment on Pryor's false arrest claim as to his obstruction of justice charge.

*Resisting Arrest.* To evaluate whether defendants appropriately arrested Pryor for this crime, we must decide (1) whether probable cause for an underlying offense existed to arrest Pryor, (2) when Pryor was under arrest, and (3) whether Pryor resisted arrest as defined by 720 ILCS 5/31–1. *See* 720 ILCS 5/31–1; *Abbott*, 705 F.3d at 719–20.

First, as explained above, a reasonable officer in Corrigan's position could have concluded that Pryor was leaving a lawful traffic stop. Corrigan consequently had probable cause to arrest and to charge Pryor.

Second, an arrest occurs when "a reasonable person in the suspect's position would have understood the situation to constitute a restraint on freedom of movement" and submits to the known police officer. *Tebbens v. Mushol*, 692 F.3d 807,

816 (7th Cir. 2012) (citing *Ochana v. Flores*, 347 F.3d 266, 270 (7th Cir. 2003)). Here, the emergency lights were activated on Corrigan's police vehicle, and he ran toward Pryor ordering him to "get on the ground." Pryor stopped and raised his hands, then lowered them as Corrigan approached. As the district court explained, Pryor's actions constituted submission because no reasonable person would have felt "free to decline the officer's request or otherwise terminate the encounter." *Kernats v. O'Sullivan*, 35 F.3d 1171, 1177 (7th Cir. 1994) (quoting *Florida v. Bostick*, 501 U.S. 429, 435–36 (1991)). So, at this point Pryor was under arrest.

Third, because Pryor was under arrest, any subsequent resistance violates 720 ILCS 5/31–1. Resistance under Illinois law is an action that "impedes, hinders, interrupts, prevents, or delays the performance of the officer's duties" and is defined as "withstanding the force or effect of or the exertion of oneself to counteract or defeat." *Brooks v. City of Aurora*, 653 F.3d 478, 484 (7th Cir. 2011) (quoting *People v. Agnew-Downs*, 936 N.E.2d 166, 173 (2010)). This is true even if the arrest was "unlawful." *Id.* (quoting *Hardrick v. City of Bolingbrook*, 522 F.3d 758, 762 (7th Cir. 2008) (citing *People v. Villarreal*, 604 N.E.2d 923, 926–27 (1992))).

In *Brooks*, this court held that an officer had probable cause to arrest for resisting under 720 ILCS 5/31–1(a) when the subject pulled back from the officer's attempt to seize him. 653 F.3d at 483–84. Here, Pryor refused Corrigan's orders to "get on the ground." Instead, Pryor began to lower his arms as Corrigan ran toward him. This prevented Corrigan from gaining control of Pryor and placing him in handcuffs. Once on the ground, Pryor continued to resist Corrigan's attempt to place his hands behind his back to restrain him. A reasonable

officer in Corrigan's place could have believed that Pryor re-
sisted within the meaning of 720 ILCS 5/31-1(a).

Altogether, Corrigan could appropriately arrest Pryor for
resisting arrest. The district court did not err in granting Cor-
rigan summary judgment on Pryor's false arrest claim on this
charge.[2]

**B. Excessive Force**

Qualified immunity rests on two questions: "first, whether
the facts presented, taken in the light most favorable to the
plaintiff, describe a violation of a constitutional right; and sec-
ond, whether the federal right at issue was clearly established
at the time of the alleged violation." *Smith*, 10 F.4th at 737. If
the plaintiff fails to prove either prong, "the defendant official
is protected by qualified immunity." *Id.* (citing *Koh v. Ustich*,
933 F.3d 836, 844 (7th Cir. 2019)). Pryor argues the district
court erred in granting Corrigan qualified immunity against
Pryor's claim of excessive force during the leg sweep and
tackle, in violation of the Fourth Amendment.[3]

The district court, in its discretion, addressed only the sec-
ond prong of the qualified immunity analysis—whether the

---

[2] Pryor sued the remaining ten defendants under theories of failure to
intervene and supervisor liability. Given that Corrigan had probable cause
to arrest Pryor for resisting arrest or obstructing justice, there is no under-
lying constitutional violation in the arrest. *See supra*, Section II.A. Thus, the
district court properly granted summary judgment to the remaining de-
fendants on Pryor's false arrest claim.

[3] Pryor also argues that the district court should not have granted
qualified immunity when facts are disputed. But, as discussed above, the
district court correctly interpretated the dashcam video footage. So, we
reject this argument.

right at issue was "clearly established" at the time of the incident—without first determining whether a constitutional violation occurred. *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009) ("judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first"). A constitutional right is clearly established "if the right in question is sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Smith*, 10 F.4th at 742 (cleaned up). In addition, the right must be "defined with specificity." *Id.* To decide whether a right satisfies these requirements, we "analyze whether precedent squarely governs the facts at issue… ." *Id.* (citing *Strand v. Minchuk*, 910 F.3d 909, 917 (7th Cir. 2018)).

The parties discuss two cases, *Johnson v. Scott*, 576 F.3d 658 (7th Cir. 2009) and *Hollingsworth v. City of Aurora*, No. 11 CV 4597, 2014 WL 7204083 (N.D. Ill. Dec. 11, 2014). But neither parallels this one. In *Johnson* and *Hollingsworth*, officers were granted qualified immunity for tackling suspects. But both cases involved violent underlying crimes. *See Johnson*, 576 F.3d at 660 (noting that "there were two serious crimes at issue: a shooting and reckless flight from the police in a vehicle"); *Hollingsworth*, 2014 WL 7204083, at *3 (explaining that "the initial crime at issue was a robbery involving a substantial amount of money"). And both involved longer police chases. *See Johnson*, 576 F.3d at 661 (characterizing Johnson's attempt to evade police in his car and on foot as "reckless and determined"); *Hollingsworth*, 2014 WL 7204083, at *4 (describing Hollingsworth's "jump out of a moving vehicle"). This case does not present such extreme facts.

Relying on these differences, Pryor submits that an officer tackling someone was acceptable in *Johnson* and *Hollingworth*, but this case is not like *Johnson* and *Hollingsworth*, so tackling was unacceptable here. Pryor's argument is flawed because those two cases do not clearly establish when tackling is impermissible. To satisfy his burden, Pryor needs to show that it is "beyond debate" that the tackle here was unacceptable. *See Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). He must establish that tackling is clearly a constitutional violation in cases like this one. Neither *Johnson* nor *Hollingsworth* does that, so Pryor fails to meet his burden.

Pryor also cites two cases explaining that "police officers do not have the right to shove, push, or otherwise assault innocent citizens without any provocation whatsoever." *Taylor v. City of Milford*, 10 F.4th 800, 808 (7th Cir. 2021) (citing *Clash v. Beatty*, 77 F.3d 1045, 1048 (7th Cir. 1996)); *see also Gupta v. Melloh*, 19 F.4th 990, 1001 (7th Cir. 2021). Again, these cases are distinguishable. Here, because of the informant's tip about the possibility of drugs and the surveillance background, a reasonable officer in Corrigan's circumstances could have believed Pryor committed a dangerous act of provocation when he exited the van and traveled down the driveway. *Common v. City of Chicago*, 661 F.3d 940, 943 (7th Cir. 2011) ("This standard requires that a fact finder analyze whether the officer's actions are objectively reasonable in light of the facts and under the circumstances confronting the officer at the time of the incident, without regard to the underlying motive or intent of the officer, and without the benefit of hindsight."). For all Corrigan knew, he faced a dangerous situation involving drugs and two individuals fleeing a lawful traffic stop. What Corrigan knew before the alleged use of force matters, not what he learned after. *See Graham v. Connor*, 490 U.S. 386, 396 (1989)

("The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.").

Qualified immunity "protects actions in the hazy border between excessive and acceptable force." *Mullenix v. Luna*, 577 U.S. 7, 18 (2015) (cleaned up). Pryor has not shown that it was clearly established when he was tackled that such force was excessive under the Fourth Amendment. So, the district court did not err in finding Corrigan's tackle protected by qualified immunity.[4]

*          *          *

We affirm the district court's grant of summary judgment on parts of Pryor's false arrest and excessive force claims. Our dissenting colleague takes a different view of the factual record. We offer an overarching response and then counter the specific contentions.

Our review and consideration of the Corrigan and Isaak dashcam videos is criticized as "usurp[ing] the jury's role" and invading "the province of the jury." But our dissenting colleague has not offered a clear line separating when a video

---

[4] Pryor contends the district court erred by granting Corrigan summary judgment on his leg sweep and tackle of Pryor but allowing Corrigan's two punches of Pryor to go to trial. By separating these actions that occurred only seconds apart, Pryor claims the court "creat[ed] an almost impossible case to try."

But Pryor cites no authority in support of his claim. And we see no error in presenting to the jury the punches, on which the parties presented conflicting evidence and the video is inconclusive. Nor did the court err in deciding that Corrigan warranted qualified immunity for the tackle. Pryor has failed to offer case law that holds beyond debate that the tackle here is impermissible.

depiction allows for recognizing facts as established for summary judgment versus reserving a factual dispute for a jury. After innumerable viewings of the videos and thorough review of this voluminous record, we remain comfortable drawing that line in the same place as the district court. As that court correctly concluded, certain video depictions are susceptible to different reasonable interpretations, such as the excessive force claim on the two punches. Or, the video is captured from too far away, such as Corrigan's second search of Pryor. But most of the events that form the basis for Pryor's many claims are plainly portrayed, unobstructed and in their entirety, in one or both videos. So, neither the parties nor the district court were mistaken to consider and rely on them in the manner they did.[5]

---

[5] The dissent cites several authorities which suggest it is improper to rely on videos in these circumstances. But those decisions are factually distinguishable.

*Kailin v. Village of Gurnee*, 77 F.4th 476 (7th Cir. 2023), involved a six-second video, without audio, in which an officer shot a dog, and in which the audio was key to the case's resolution. *Id.* at 482. The dashcam videos here are much longer (Corrigan's 52 minutes, Isaak's 31 minutes), and even if only the traffic stop and arrest portions are considered, they last a few minutes and include audio.

In *Jackson v. Curry*, 888 F.3d 259 (7th Cir. 2018), this court said a "video is bound to be subject to varying interpretations." *Id.* at 264. There—opposite from here—the district court did not even view the video in question, *id.* at 263, and our court concluded it lacked jurisdiction to review that decision not to watch the video. *Id.* at 263–64.

In *Gant v. Hartman*, 924 F.3d 445 (7th Cir. 2019), the video depicted the plaintiff standing in a doorway, arm extended holding a door, and then his arm lowering slightly before an officer fired, all occurring within a

The dissent also reviews several resisting and obstructing episodes, disputing that the videos show that probable cause existed to arrest Pryor. But the dissent's descriptions of the videos and findings of disputed inferences are unduly cramped.

Before the traffic stop, the officers had substantial information about drugs, as well as surveillance that had been performed concerning the driver and the van. The videos also show the officers driving behind the van through Aurora for blocks before the traffic violation.

As for resisting arrest, when Corrigan approached Pryor at the end of the driveway, Pryor was seized when he was no longer free to leave. *See Tebbens*, 692 F.3d at 816 (7th Cir. 2012) (citation omitted). The video unquestionably conveys Corrigan's commands to Pryor and his failure to follow those commands. Our colleague cites to "common sense" that resistance is not possible before an arrest has been attempted. But these events occurred in 2015, and not until 2021 did Illinois enact the version of 720 ILCS 5/31-1(d) which requires an underlying offense before arrest for resisting.

The videos do not require inferences to conclude that Pryor leaving the van and traveling down the driveway constituted obstruction. The officers were executing a lawful traffic stop. Regardless of how fast Pryor traveled, he left the van during that stop, proceeded away from the vehicle, admitted

---

single second. *Id*. at 450. From that snippet our court concluded that material facts were in dispute, foreclosing interlocutory appellate jurisdiction. *Id*. at 448–51. The videos here are much longer than in *Gant* and depict most of the events that form the basis of Pryor's claims and the officers' defenses.

he was moving away from the officers, and stopped only after Corrigan's commands.

The same is true for obstruction for Pryor's refusal to get on the ground. Our dissenting colleague says the videos are not definitive, and that Pryor's protest that he had insufficient time to get down created a fact issue. But his claim is "clearly contradicted" by the dashcam videos which capture the commands for Pryor to get on the ground, his failure to do so, and the duration of his delay. *See Finkley*, 10 F.4th at 730.

As for resisting during handcuffing, Illinois law prohibits an individual from delaying, impeding, or hindering the performance of a police officer's duties. The videos are not unclear that Pryor's actions meet at least one, if not all three of these prohibitions. The Isaak dashcam video shows the one minute in which Corrigan approached Pryor, executed the leg sweep and tackle, and Corrigan handcuffed him.[6] The Corrigan dashcam video, for approximately three and a half minutes, shows Pryor stopping at the end of the driveway; Corrigan leg sweeping, tackling, handcuffing, and searching Pryor; them discussing why he was taken down; and Corrigan helping Pryor up.[7]

Last, our dissenting colleague concludes that Corrigan should not have been granted summary judgment on the leg sweep and tackle because whether that force was excessive depends on if Pryor was resisting or submitting to the officers. Even if there was a fact dispute as to the resisting, though,

---

[6] Dist. Ct. Ex. 18, Isaak dashcam video and audio, 0:53–1:50.

[7] Dist. Ct. Ex. 17, Corrigan dashcam video and audio, 1:00–4:34.

Pryor has cited no case law that in these circumstances Corrigan's actions were impermissible.[8]

Without clearly established case law that the leg sweep and tackle here were impermissible beyond debate, the district court properly granted Corrigan qualified immunity on this portion of Pryor's excessive force claim.

**C. Illegal Searches**

Pryor claims certain defendants searched him three times. The district court granted defendants summary judgment on the two searches performed by Corrigan and recorded on video. The third search, performed by Cantona and not recorded, was contested at trial. Pryor reasserts that the police did not have probable cause or reasonable suspicion to believe he possessed drugs or a gun. To Pryor, defendants had no justifiable reason to search him, and the district court erred in granting defendants summary judgment on the first two searches.

We have "recognized that, given the dangers of drug trafficking, guns and drugs often go hand in hand." *United States v. Jones*, 900 F.3d 440, 449 (7th Cir. 2018). Corrigan assisted in a lawful traffic stop of a van related to suspected drug activity.

---

[8] Neither of the authorities our dissenting colleague references on this point involved facts remotely like the leg sweep and tackle here.

In *Gupta v. Melloh*, 19 F.4th 990 (7th Cir. 2021), an intoxicated arrestee was handcuffed and fell and fractured a vertebra in his neck. *Id*. at 995–1000. There, an officer placed his hands on the arrestee's arm and pulled him forward, purportedly because the arrestee was actively resisting arrest. *Id*. at 997–98. And in *Miller v. Gonzalez*, 761 F.3d 822 (7th Cir. 2014), the officer leaped a chain link fence and landed with his knee directly on the plaintiff's head, breaking his jaw. *Id*. at 825.

He saw Pryor get out of the van and move quickly down the driveway toward the street. For these reasons, Corrigan could have reasonably believed that Pryor was fleeing and had drugs or a weapon on his person.

It is a "bright-line rule that police are entitled to search the persons and possessions of everyone arrested on probable cause, with or without any reason to suspect that the person is armed or carrying contraband." *United States v. Jackson*, 377 F.3d 715, 716 (7th Cir. 2004) (discussing the search of a defendant who was "stopped for a traffic violation, arrested, and taken into custody") (citing *Gustafson v. Florida*, 414 U.S. 260 (1973) and *United States v. Robinson*, 414 U.S. 218 (1973)). Corrigan thus could constitutionally search Pryor incident to arrest. Such a search can be "'a relatively extensive exploration of the person.'" *Campbell v. Miller*, 499 F.3d 711, 717 (7th Cir. 2007) (citing *Robinson*, 414 U.S. at 235). But it becomes unlawful when the search is conducted in a manner that is "'extreme or patently abusive.'" *Id.* (citing *Robinson*, 414 U.S. at 236).

The district court correctly found that Corrigan's two searches of Pryor were not "extreme or patently abusive." First, there is no support in the record that Corrigan searched Pryor for sexual gratification or to humiliate him. Second, there was no evidence that Corrigan exposed Pryor's private parts to the public. At most, as Pryor argues, the searches exposed his boxers. But this contention is insufficient to create a genuine issue of fact about whether the search exposed his private parts. *See United States v. Williams*, 209 F.3d 940, 943–44 (7th Cir. 2000) (holding that an officer may conduct "a full search of the person," including "pat[ting]-down" and subsequently "sliding his hand under [a defendant's] waistband and down the back part of his pants," as long as the defendant

"was never disrobed or exposed to the public"). Third, Pryor alleges that during the first search Corrigan "searched him thoroughly, going up his boxers, [and] into his private area" and during the second search Corrigan "put his hand down inside the front of Plaintiff's boxers and searched, touching his genitals." But those allegations, even if true, do not amount to a strip or body cavity search. *See id.* Thus, there is no factual support to establish that Corrigan's two searches incident to arrest were unlawful.[9]

### III. Jury Trial

Pryor also challenges many of the evidentiary and procedural rulings before and at the jury trial. The evidentiary rulings, including on motions *in limine*, are reviewed for abuse of discretion. *Turubchuk*, 958 F.3d at 548. When rulings involve a question of law, though, review is de novo. *Id.* We also review jury instruction decisions for abuse of discretion. *E.E.O.C. v. AutoZone, Inc.*, 809 F.3d 916, 921–22 (7th Cir. 2016). And harmlessness is evaluated "in light of the entire record,"

---

[9] Pryor also claims the district court abused its discretion when it barred him from testifying as to the "cumulative effect" of the three searches. He says Cantona's third search was unreasonable because Corrigan had already searched him two times. But the district court correctly noted that Pryor first raised this argument one week before trial. It was not offered in the complaint, during discovery, or in the cross–motions for summary judgment. Because Pryor tried to add a new theory of liability just before trial, the district court did not abuse its discretion in precluding it. *See* FED. R. CIV. P. 15(a)(2); *Liebhart v. SPX Corp.*, 917 F.3d 952, 964 (7th Cir. 2019) (explaining when a court can deny an amendment under Rule 15). Further, any error that might have occurred on this point was harmless. Cantona denied performing a third search. He testified he "was not even on the scene until way later." So, any theory of cumulative effect would not have affected the jury's decision.

and "[w]here there are several errors, each of which is harm-
less in its own right, a new trial may still be granted if the cu-
mulative effect of those otherwise harmless errors deprives a
litigant of a fair trial." *Nelson v. City of Chicago*, 810 F.3d 1061,
1075 (7th Cir. 2016) (citing *Barber v. City of Chicago*, 725 F.3d
702, 715 (7th Cir. 2013)).

Pryor claims the district court erred in: (1) allowing evi-
dence regarding Corrigan's and Cantona's drug surveillance;
(2) barring Pryor from testifying that he was not involved in
illegal drug activity and that the police did not locate any
drugs during the incident; (3) allowing Corrigan to testify
about his knowledge of the area and limiting Pryor's testi-
mony about race; (4) allowing Corrigan's statements made in
his dashcam video and testimony at trial; and (5) denying
Pryor's jury instruction regarding who would pay any judg-
ment.

**A. Surveillance Evidence**

Pryor sought to bar all evidence about the drug surveil-
lance conducted before his arrest. He claims the court erred in
admitting that evidence because the officers did not observe
any criminal activity and the informant's name was never dis-
closed. Surveillance evidence thus would be "speculative and
grossly prejudicial to plaintiff."

The district court denied in part and granted in part
Pryor's motion. In a lengthy order, the court explained this
evidence was relevant for two reasons. First, surveillance in-
formation "provides important context for the traffic stop."
Second, "the suspicion of drug-related activity also has a
bearing on the reasonableness of the use of force."

Courts consider the totality of the circumstances to evaluate whether an officer used more force than reasonably necessary to effectuate an arrest. *See Graham*, 490 U.S. at 396; *Phillips v. Cmty. Ins. Corp.*, 678 F.3d 513, 519 (7th Cir. 2012). This can include "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396; *see also Turner v. City of Champaign*, 979 F.3d 563, 567 (7th Cir. 2020). And "[i]n order to assess objective reasonableness, the [jury] must consider all the circumstances." *Johnson*, 576 F.3d at 660.

Here, the evidence about the drug surveillance provided context for the jury when they viewed the dashcam videos. This included why multiple police officers followed the van, the circumstances of the traffic stop and foot chase, and the chronology of events. Without this context, the district court found, the jury would have difficulty "understanding why the traffic stop played out as it did," as there would be a "chronological gap and a conceptual hole in the story if the jury watched the videos without some explanation for how the whole thing got started." *See United States v. Boros*, 668 F.3d 901, 907 (7th Cir. 2012) ("[O]ne measure of relevance is whether its exclusion would leave a chronological and conceptual void in the story.") (quotations omitted); *Whitehead v. Bond*, 680 F.3d 919, 930–31 (7th Cir. 2012) (evidence giving rise to a traffic stop is relevant to an excessive force claim and not unfairly prejudicial).

As the district court stated, the drug surveillance information was relevant to Corrigan's use of force based on the Seventh Circuit Pattern Jury Instructions and an in-depth analysis of the *Graham* factors. For example, the surveillance

"created a suspicion that the occupants of the van were engaged in criminal activity" and provided important context for the flight. It also spoke to the "severity of the crime" and situated Corrigan's perception of the threat. Accordingly, the court did not abuse its discretion in allowing this limited information into evidence at trial.

Pryor does not dispute that the drug surveillance goes to the reasonableness of Corrigan's use of force. Instead, Pryor asserts the district court endorsed "a drug stop and arrest, absent any showing of probable cause or reasonable suspicion." He claims that characterization provided defendants "a justification for the use of force on Plaintiff." But the record does not support Pryor's argument. Defendants did not discuss probable cause at trial, and they did not argue that this was a drug stop or drug arrest. In fact, the court denied defendants' motion to instruct the jury that Corrigan had probable cause to arrest Pryor and that the initial tackle was a reasonable use of force.

Pryor also contends the district court erred in allowing the informant to remain confidential because it "ruled that the information [provided by the informant] was not relevant to Plaintiff's interaction with the police later on Fenton Street." First, during depositions, Pryor learned what the informant had told Cantona and why Cantona believed the informant was reliable. Second, Pryor misstates the court's ruling. The court said, "Plaintiff does not adequately demonstrate how the identity of the alleged informant is relevant to Plaintiff's arrest for obstruction of Officer Corrigan." It was not an abuse of its discretion to rule that the identity of the informant—allegedly to evaluate reliability—is irrelevant to Pryor's excessive force or illegal search claims.

**B. Pryor's Barred Testimony and Presentation of Admissions**

Under Federal Rule of Evidence 403, relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice." *United States v. Earls*, 704 F.3d 466, 471 (7th Cir. 2012). To Pryor, the district court abused its discretion by barring his testimony and defendants' discovery responses showing that he was not involved in illegal drug activity and that the police did not locate any drugs on his person or in the van. Pryor submits that the district court's rulings "weighed heavily in Defendants' favor, with Defendants being allowed to claim that Plaintiff was involved in drug trafficking, and Plaintiff being unable to counter that."

Yet before trial, the district court made multiple decisions favorable to Pryor about his alleged drug activity. The court ruled that "Defendants may not introduce evidence, testimony, or arguments indicating that they believed that Plaintiff is a drug dealer." And "Defendants should not suggest or argue to the jury that Pryor was, in fact, engaged in drug-related illegality." In sum, "Defendants should not paint Plaintiff as a drug dealer, or anything of that sort." The court further alleviated prejudice to Pryor by barring evidence that Corrigan found cash on Pryor during his search. This precluded an inference that Pryor had "drug money" on him.

The district court also properly discussed the risks of prejudice against defendants, aiming to limit equally what both parties could discuss. The court found that "the risks of unfair prejudice tug in both directions." "[T]he fact that Pryor did not possess any drugs has low probative value, if any." And "[w]hether Pryor in fact possessed drugs has no bearing on

whether Officer Corrigan exercised reasonable force when he struck Pryor." Again, the district court explained that "the reasonableness of force turns on the knowledge of the officer at that moment in time, not in hindsight. … And here, the search of Pryor took place after Corrigan restrained him, not before." So, Pryor could "not argue that the traffic stop, the physical interaction, or the arrest were unlawful because he was not in fact involved in the drug trade."

At the beginning of trial, the court instructed the jury:

> During trial, you may hear evidence that the police performed the traffic stop in connection with a drug-related investigation. Mr. Pryor was not arrested for a drug-related offense. Mr. Pryor was not charged with a drug-related offense.

The court repeated this instruction near the end of trial. During two pre-trial conferences, Pryor's counsel agreed with this approach.

Moreover, at trial Pryor's counsel mentioned the lack of drugs multiple times, including when Pryor testified:

> Q. Okay. Were you arrested for a drug offense that day?
>
> A. No, I was not.
>
> Q. Were you charged with a drug offense?
>
> A. No, I was not.

And Pryor's counsel had a similar conversation with Corrigan during his testimony:

Q. You did not arrest Mr. Pryor for a drug of-
fense, did you?

A. No, I did not.

Q. You did not charge him with a drug offense,
right?

A. No, I did not.

Further, despite the trial court precluding the parties from
discussing the details of the drug surveillance, Pryor's coun-
sel argued in closing:

> Remember Mr. Cantona's testimony. He said he
> conducted a surveillance of a Kane Street resi-
> dence, a conversion van, and someone named
> Raymond Johnson. His surveillance consisted
> of watching 1020 Kane Street for a van. He saw
> no drug transaction. He saw no criminal activ-
> ity. He didn't have enough information to go to
> a judge to get a search warrant for the Kane
> Street property.

Thus, although the court prohibited Pryor from testifying
that he was not involved with drugs, the jury knew that Pryor
was not arrested for or charged with a drug-related offense.
This mitigated the risk that the jury would be misled into
thinking that Pryor was involved with illegal drug activity
and that the police located drugs on Pryor—the facts Pryor
wanted to testify about.

With this full view of the evidence, we do not see any
abuse of discretion in the district court's limits on Pryor's tes-
timony and his presentation of admissions on the lack of drug
activity.

### C. Geographic Area and Race-Based Testimony

Pryor's next argument stems from three district court rulings on motions *in limine*. First, defendants could not testify that the arrest took place in a "high crime area." Second, Corrigan could testify about his knowledge of specific incidents in that area. Third, Pryor could not testify about the race-based reasons for his actions.

The district court allowed Corrigan to testify about specific incidents he was aware of when he arrested Pryor, including that members of his unit had recently been shot at in the area. The court reasoned that "knowledge of specific acts of violence against police officers in the area is relevant to the reasonableness of the use of force." The court explained this was "part of the 'totality of the circumstances'" necessary to determine whether an officer used more force than reasonably necessary to effectuate an arrest. *See Graham*, 490 U.S. at 396; *Phillips*, 678 F.3d at 519. And it commented that "[s]uch acts have a bearing on how a reasonable officer would have responded in that situation … [because a] reasonable officer could take a need for personal safety into account." The district court did not abuse its discretion in allowing Corrigan to testify to specific acts of violence because it was relevant to Pryor's excessive force claim.

Next, Pryor does not address whether Corrigan's knowledge of specific instances in the same area where he was arrested is relevant to the reasonableness of force. Instead, Pryor submits it was unfair that Corrigan was allowed to testify to the above, while Pryor was barred from telling the jury that he was afraid of the police and exited the van because "he had seen on the news what police have done to other black men." But Pryor does not explain how his two statements are

relevant to the excessive force or illegal search claims. Even more, the court did allow Pryor to tell the jury that he was afraid, the court just limited Pryor's explanation of why. ("If he was afraid, he can testify that he was afraid. There is no need to tell the jury why he felt afraid. He can testify about what he did, but he cannot get into social justice issues writ large.").

The district court concluded that the testimony Pryor sought to introduce was more prejudicial than probative and was "likely to distract and confuse the jury." It was "not aware of any evidence suggesting that racial animus played a role in the events in question." Generalized evidence about the police, such as a "'code of silence' is unduly prejudicial and may not be used at trial." *Townsend v. Benya*, 287 F. Supp. 2d 868, 876 (N.D. Ill. 2003). So, the court did not abuse its discretion by barring Pryor from making irrelevant, race–related statements.

### D. Corrigan's Dashcam Statements and Testimony

Pryor argues the district court abused its discretion when it allowed the jury to hear Corrigan's statements, captured in the dashcam video. He claims the statements were hearsay that confused the issues, misled the jury, and improperly played to jurors' sympathies. But Pryor is incorrect for several reasons.

First, Corrigan's statements recorded by the dashcam were not hearsay. Defendants did not offer Corrigan's statements to prove the truth of the matter asserted. Rather, they offered the statements to show Corrigan's state of mind and rebut a claim of actual malice, which was directly relevant to Pryor's punitive damages claim. *See* FED. R. EVID. 801(c)(2).

Second, Pryor argues that by playing the video, "Defendants succeeded in instructing the jury erroneously on the law." Pryor, pointing to Corrigan's statements that Pryor should not have exited the vehicle, claims Corrigan's summary of the law was incorrect. But Corrigan did not use the words "legal" or "illegal" in his discussion with Pryor about exiting the van. Instead, he said, "when police stop the car and you get out and run from it, that's a problem" and "the crazy part is that when you normally get stopped by the police, you don't run from the car, that's the crazy part."

The district court found Corrigan's statements relevant to Pryor's malice claim. It concluded there was "little risk that the jury will be confused about the governing law based on the short statement." The court's jury instructions cement that conclusion:

> Any statement of the law comes from the Court only. It does not come from any statements made by any of the parties, including anything said in the videos during the conversation between Plaintiff Pryor and Defendant Corrigan.

And Pryor's counsel approved the instruction—"we would strongly be in favor of such an instruction."

Third, Pryor contends the district court should not have allowed the jury to hear Corrigan's statements that he did not know whether Pryor had a gun, followed by "I got a family. You know what? I'd like to go home tonight." Pryor also objects to the court permitting Corrigan to explain why he made those statements. Nevertheless, Federal Rule of Evidence 106 provides that "[i]f a party introduces all or part of a statement, an adverse party may require the introduction … of any other

part—or any other statement—that in fairness ought to be considered at the same time." And the "adverse party may do so over a hearsay objection." *Id*. So, the entirety of this exchange was permissible.

Fourth, Pryor challenges the district court's decision to allow Corrigan's testimony about his fears that Pryor may be a dangerous person. As explained above, given the context of the incident, Corrigan had reason to fear that Pryor possessed a gun. *See Jones*, 900 F.3d at 449. And Corrigan's fear that Pryor posed a danger is directly relevant to his justification for force.

Fifth, Corrigan's statement that Pryor was a dangerous person because he was a "maybe person" was relevant and not unduly prejudicial. At trial Corrigan testified twice that Pryor was a "maybe person." The first time, the district court sustained Pryor's objection that it was inadmissible as expert testimony. But the second time, defense counsel asked, "where in your training do you receive that information?" And Pryor's counsel did not object until Corrigan laid the foundation of his training. Then, the district court limited Corrigan's testimony to "what he saw and how it related to his training and how it matched up."

As Corrigan explained, the most dangerous type of person for an officer to come across in the field is a "maybe person"—someone who says one thing but whose actions indicate otherwise. Corrigan's testimony about his observations of Pryor on the day of the incident, and how that related with his training, is relevant to his justification for using force. We therefore affirm the district court's ruling. And given the district court's limiting instruction, any error was harmless. *See United States v. York*, 572 F.3d 415, 421–22 (7th Cir. 2009) (district court's failure to identify officer as expert was harmless when

knowledge and experience "would have easily qualified [the witness] as an expert had the court conducted the formal Rule 702 analysis").

### E. Jury Instructions

Finally, Pryor asserts the district court should have instructed the jury that the City of Aurora, not the individual defendants, would pay any judgment. He claims the district court improperly implied to the jurors during voir dire that Corrigan and Cantona would pay any judgment. Specifically, two jurors had concerns with awarding a judgment in Pryor's favor if Corrigan and Cantona had to pay. But the court granted Pryor's motion to remove the first juror for cause. And the second juror consistently stated he would be fair to both sides, and that if the evidence favored Pryor, he would return a verdict in favor of Pryor even though Corrigan and Cantona are sued individually.

Even more, any evidence or argument about indemnification is barred at trial as irrelevant and highly prejudicial under Federal Rules of Evidence 401 and 403. *See Lawson v. Trowbridge*, 153 F.3d 368, 378–79 (7th Cir. 1998); *Betts v. City of Chicago*, 784 F. Supp. 2d 1020, 1030 (N.D. Ill. 2011); *Christmas v. City of Chicago*, 691 F. Supp. 2d 811, 819 (N.D. Ill. 2010). The only exception is when defendants raise an officer's inability to pay damages; then, a plaintiff may introduce evidence of indemnification. *See Lawson*, 153 F.3d at 378–79.

Defendants did not introduce any evidence regarding Corrigan's or Cantona's inability to pay. In fact, defendants did not oppose Pryor's motion *in limine*—which the district court granted—barring defendants from using financial circumstances as a defense to Pryor's request for punitive

damages. So, the district court was within its discretion not to instruct the jury that the City of Aurora, not the individual defendants, would pay any judgment.

### IV. Conclusion

The district court properly granted defendants' summary judgment motion on Pryor's § 1983 claims. And the district court did not abuse its discretion in its evidentiary and procedural rulings before and at trial. For these reasons, we AFFIRM.

ROVNER, *Circuit Judge, concurring in part and dissenting in part*. This court has oft warned that judges must resist "the siren song that tempts courts into making factual determinations at the summary judgment phase." *Gupta v. Melloh*, 19 F.4th 990, 996 (7th Cir. 2021). Some courts have justified succumbing to that impulse by referencing the Supreme Court's statement in *Scott v. Harris* that "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007). *Scott* did not announce a new rule, but merely applied an old rule to new technology—police dashcam video. It has always been the case that on summary judgment a court need not credit facts that are so incredible or implausible that no reasonable fact finder could believe them. *Payne v. Pauley*, 337 F.3d 767, 773 (7th Cir. 2003); *Hurt v. Wise*, 880 F.3d 831, 840 (7th Cir. 2018) (explaining how this rule applies to video evidence). Outside of this narrow scenario of implausibility, however, fact finding remains firmly within the province of the jury. It is the right of the parties to fully present their evidence to a fact finder, explain discrepancies, describe nuances, caution against biases, or offer expert testimony about the evidence. It is only after this full airing of evidence that a fact finder will be in a sufficient position to weigh evidence, decide which inferences to draw from the facts, and resolve factual disputes. *See Johnson v. Advoc. Health & Hosps. Corp.*, 892 F.3d 887, 893 (7th Cir. 2018). In upholding the district court's dismissal on summary judgment, the majority has usurped the jury's role by making its own factual determinations from the disputed video evidence. For this reason, I dissent from the majority's holdings affirming

summary judgment as to the false arrest and excessive force claims. I concur as to the remaining issues.

Fact finding is essential to evaluations of probable cause because those determinations depend on the facts and circumstances known to the reasonable officer at the scene. *D.C. v. Wesby*, 583 U.S. 48, 57 (2018). Only when there are no material facts in dispute may a court decide whether officers had probable cause as a matter of law. *Braun v. Vill. of Palatine*, 56 F.4th 542, 550 (7th Cir. 2022) (*quoting Holloway v. City of Milwaukee*, 43 F.4th 760, 769 (7th Cir. 2022)).

A police officer has probable cause to arrest if a reasonable officer, knowing all of the facts and circumstances known to that officer, would believe that the individual in question has committed or is committing a crime. *United States v. Cherry*, 920 F.3d 1126, 1133 (7th Cir. 2019). It follows that the question for this case is: what crime could a reasonable officer believe Pryor had committed or was committing? As the majority points out, Officer Corrigan could have been subjectively incorrect in his reasoning; probable cause looks through an objective lens to the reasonable officer. *United States v. Wanjiku*, 919 F.3d 472, 487 (7th Cir. 2019).

1. *Probable cause for resisting arrest at the moment of seizure?*

At the moment Officer Corrigan arrived at the scene, he could not have arrested Pryor for resisting arrest. In Illinois, an officer may not arrest a suspect for resisting arrest unless there is an underlying offense. It is true, as the majority points out, that the Illinois legislature did not codify this concept into statutory law until 2021 (*see* 720 ILCS 5/31-1(d)), but it had been established by caselaw in Illinois for some time. *See Abbott v. Sangamon Cnty., Ill.*, 705 F.3d 706, 720 (7th Cir. 2013)

(noting that the officer lacked probable cause to arrest the defendant for resisting arrest under Illinois law, inasmuch as there had been no arrest or attempted arrest prior to that point); *People v. Slaymaker*, 2015 IL App (2d) 130528, ¶ 13, 27 N.E.3d 642, 645 (explaining that the statute prohibiting resisting arrest does not apply where police are not effectuating an arrest); *People v. Agnew-Downs*, 936 N.E.2d 166, 174 (Ill. App. Ct. 2010) (noting that the trial court recognized that pinpointing the time of arrest was crucial in determining whether the defendant had in fact resisted arrest). In any event, in addition to the Illinois case law at the time and the now-confirmatory statutory law, common sense dictates that one cannot be arrested for resisting arrest before an arrest has been attempted.

2.  *Probable cause for obstructing a police officer for leaving a lawful stop?*

The majority concludes that a reasonable officer in Corrigan's position could have surmised that Pryor was leaving a lawful traffic stop, and therefore had probable cause to arrest him for resisting or obstructing a police officer pursuant to 720 ILCS 5/31-1. Majority Op. at 11 (*citing People v. Johnson*, 945 N.E.2d 2, 7, 14–15 (Ill. App. Ct. 2010)). That statute prohibits a person from "obstruct[ing] the performance by one known to the person to be a peace officer … of any authorized act within his official capacity," (720 ILCS 5/31-1(a)), which has been interpreted to mean "conduct [that] interpose[s] an obstacle that impedes or hinders the officer in the performance of his

authorized duties." *People v. Baskerville*, 2012 IL 111056, ¶ 23, 963 N.E.2d 898, 905.[1]

The majority and I are in agreement that "a traffic stop of a car communicates to a reasonable passenger that he or she is not free to terminate the encounter with the police and move about at will." *Arizona v. Johnson*, 555 U.S. 323, 333 (2009).[2] And we need not spend time deciding at what precise

---

[1] The statute, 720 ILCS 5/31-1(a), includes both the terms "resisting" and "obstructing a peace officer." Illinois courts do not appear to distinguish charges based on "resisting" from those on "obstructing." In discussing whether the statute requires proof of a physical act, however, the Illinois Supreme court noted that the statute contains two separate verbs— "resist" and "obstruct"—and then reasoned that because "resist implies some type of physical exertion," the word "obstruct" must have a different meaning in the statute. *Baskerville*, 2012 IL 111056 ¶ 25; 963 N.E.2d at 905–06. The court concluded that "obstructing" a peace officer can involve either physical or non-physical acts that impede, hinder, interrupt, prevent, or delay peace officers from performing their duties. *Id.* ¶¶ 23–25(2012); 963 N.E.2d at 905. Mere argument will not suffice for obstruction. Neither does it require physical resistance. "That inquiry is for the trier of fact, based upon the facts and circumstances of each case." *Id*. ¶¶ 22–23, 936 N.E.2d at 904–05. In short, the Illinois Supreme Court distinguished "resisting" from "obstructing" for the purposes of inferring the types of acts the legislature meant to include, but it is unclear whether a person could be charged with separate crimes under this statute. For our purposes, the answer to this question is not important.

[2] The Illinois Supreme Court has concluded that a traffic stop is analogous to a *Terry* investigative stop. *People v. Bass*, 2021 IL 125434, ¶ 15, 182 N.E.3d 714, 719 (*citing Brendlin v. California*, 551 U.S. 249, 251 (2007)). Thus, its reasonableness is viewed through a Fourth Amendment lens to determine "whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place." *Id.* (*quoting Terry v. Ohio*, 392 U.S. 1, 20, (1968)). The majority concludes that Pryor was arrested the moment

(continued)

moment the stop here became a full arrest. If Pryor fled, it would be illegal for him to have done so from a valid *Terry* stop. A *Terry* stop is a temporary seizure, but it is a seizure nevertheless. It "imposes a substantial intrusion on a person's liberty" and restrains that person's freedom. *United States v. Street*, 917 F.3d 586, 592–93 (7th Cir. 2019). Consequently, under Illinois law, "if the passenger flees, he is attempting to avoid detention by an officer who has a valid right to seize him. Since the police officer has the right to detain him, flight by that passenger has been held to constitute an offense of obstruction of a peace officer, which constitutes a Class A misdemeanor." *Johnson*, 945 N.E.2d at 12–13 (*citing People v. Holdman*, 383 N.E.2d 155, 159 (Ill. 1978) and *People v. Jones*, 613 N.E.2d 354, 357 (Ill. Ct. App. 1993)).

These cases speak of "flight," which the majority softens to "leaving a lawful traffic stop." Indeed, in *People v. Johnson*, cited by the majority, the defendant passenger, when stopped, suddenly exited the vehicle and started running, and was apprehended a block away. The *Johnson* court relied on *Illinois v. Wardlow,* 528 U.S. 119 (2000), for the proposition that when an individual flees from police in a high-crime area, a police officer has the requisite reasonable suspicion that the individual was involved in criminal activity to conduct a *Terry* stop. *Johnson*, 945 N.E.2d at 6–7.

In this case the question remains, did Pryor flee? Some parts of the dashcam video require no inference drawing. For

Officer Corrigan ordered him to get on the ground. For my purposes the distinction does not matter, as I also conclude that Pryor was obligated to submit to the authority of the officers irrespective of whether it was a *Terry* stop or a full arrest. My analysis turns instead on the factual inquiry as to whether Pryor was, in fact, submitting.

example, by my count, Pryor took approximately three to four steps from the van door to the back corner of the van as Officer Isaak ran past him in pursuit of the driver and Officers Corrigan and Christoffel were still en route. (R. 202, Corrigan dashcam at 0:53-0:55). He then took seven faster steps from the back of the van to the front of Officer Isaak's police vehicle before Officers Corrigan and Christoffel arrived. (*Id.* at 0:56-0:59). He took his final step once he was in front of Officer Isaak's police vehicle, as he took his hands out of his pockets (or perhaps away from the pants he was holding up) and parked himself motionless, in front of Officer Isaak's vehicle, with his hands in the air. (*Id.* at 0:59); (R. 202, Isaak dashcam at 0:52-0:54). That is exactly where he stood when Officers Corrigan and Christoffel arrived. Despite the majority's description of Pryor's actions as "fleeing," (Majority Op. at 16), I surmise that many people would be surprised to learn that a passenger who takes twelve steps from their car door *toward* the pursuing police car and then stops, dead still, with his hands in the air in front of that police car, has fled the scene of a traffic stop.

A party ought to have the opportunity to explain to a jury the many reasons why a person might take a few steps away from the vehicle during a traffic stop. Pryor's post hoc explanation—that he wanted to get in front of the dashcam for his protection—is certainly among them. Many people who have been pulled over might view themselves as being more legally and physically protected in front of a recording dashcam. After all, both the potential suspect and the officer know that a person in a car has access to various sorts of items that might put the officer's life and safety in jeopardy—including the car itself. It was for these safety reasons that the Supreme Court ruled that a police officer may order either a driver or

passenger of a lawfully stopped car to exit the vehicle. *Pennsylvania v. Mimms*, 434 U.S. 106, 110–11 (1977) (driver); *Maryland v. Wilson*, 519 U.S. 408, 413–15 (1997) (passenger). And it is undoubtedly true that there are parents who have lectured their children, "if you are stopped by the police, get your hands in the air and get in front of a video camera." For that reason, a driver or passenger might wish to exit a car and immediately put her hands in the air or place them on the hood to signal to the police officer that she is of no danger to the officer. Or perhaps a driver might exit a car to step over the guardrail to avoid being struck on a narrow shoulder in the dark. *See, e.g., Mimms*, 434 U.S. at 111 (noting the dangers of traffic stops near moving traffic).

Whatever we, as individuals, think of the wisdom of exiting a vehicle when stopped by the police, Illinois law does not forbid it. In fact, in *People v. Kotlinski*, the Illinois Appellate court found that "the mere act of stepping outside the car was not an act of obstruction, because [the officer] never told defendant he had to stay inside the car." *People v. Kotlinski*, 2011 IL App (2d) 101251, ¶ 45 & ¶46 n. 6, 959 N.E.2d 1230, 1240 & n.6 (further explaining that the officer "admitted that he never told defendant that he could not get out of the car. Therefore, when defendant opened the door and stood outside of the car, he was not disobeying any order."). And in *People v. Smith*, the appellate court highlighted that it was the refusal to obey an officer's command to remain in the car that gave the officer probable cause to arrest for obstruction when the driver left his vehicle to enter his house. *People v. Smith*, 2013 IL App (3d) 110477, ¶ 21-23, 77 N.E.3d 87, 91–92. In sum, if an officer instructs a person to remain in the car, exiting it might constitute obstruction, but barring that instruction, there is simply no statutory or case law in Illinois that could make a

reasonable officer, even under qualified immunity analysis, believe that a passenger in a car had obstructed a peace officer by exiting the car and remaining close to the scene. *See Kotlinski,* 2011 IL App (2d) 101251, ¶ 45 & ¶46 n. 6, 959 N.E.2d at 1240 & n.6; *Smith,* 2013 IL App (3d) 110477, ¶ 21-23, 77 N.E.3d at 91–92.

Importantly, when Pryor took his seven steps from the back of the van to the front of Officer Isaak's police vehicle, there were no police officers on site. Officer Isaak had left the scene to apprehend the fleeing driver, and Officers Corrigan and Christoffel were driving toward the scene, but had yet to arrive. During the entire twelve steps that Pryor took, no officer told him to stay in the van, to stop moving, or to do, or refrain from doing anything. In fact, there was no officer on site to give him any direction at all. No Illinois caselaw or statute indicates that a suspect is fleeing if he takes twelve steps and then stands still with his hands in the air in front of a police car, where no officer had directed the passenger to remain in the car, or was even on the scene. I have concerns about any opinion from this court that concludes or implies otherwise.

This is, however, but one of my concerns. The other stems from the troubling trend in which appellate courts become fact finders by watching video, and drawing their own inferences, rather than leaving the fact finding to the trial court and jury. *See* Erwin Chemerinsky, *A Troubling Take on Excessive-Force Claims,* Trial, July 2007, at 74, 76. As I noted above, probable cause depends on the facts and circumstances known to the reasonable officer at the scene, and therefore heavily relies on fact-based determinations. *Wesby,* 583 U.S. at 57. Those facts must be found by a jury.

Because Pryor alleges a violation of his constitutional rights pursuant to 42 U.S.C. § 1983, any evaluation of liability requires the court to address the additional question of qualified immunity. "[Q]ualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (*quoting Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). In reviewing a defendant's motion for summary judgment based on qualified immunity, a court considers "(1) whether the facts, taken in the light most favorable to the plaintiff, show that the defendant violated a constitutional right; and (2) whether the constitutional right was clearly established at [that] time." *Estate of Clark v. Walker*, 865 F.3d 544, 550 (7th Cir. 2017). In the case of a false arrest, "[e]ven if, in hindsight, it appears that probable cause was lacking, qualified immunity is still available if the arresting officers reasonably could have believed the arrest to be lawful, in light of clearly established law and the information the arresting officers possessed. This is often called arguable probable cause." *Hurt*, 880 F.3d at 841 (cleaned up), *overruled on other grounds by Lewis v. City of Chicago*, 914 F.3d 472 (7th Cir. 2019). In this case we must ask whether the video conclusively resolves whether the officers had arguable probable cause.

Pryor alleges that he was submitting to the authority of the officers by standing still in front of the dashcam with his hands up. The defendants allege that Pryor was fleeing. This is a classic factual dispute involving the drawing of inferences from what is depicted on a video and therefore cannot be resolved on summary judgment. *See Hurt*, 880 F.3d at 840. On summary judgment, a court may not make credibility

determinations, weigh the evidence, or decide which inferences to draw from the facts, or resolve swearing contests. *Johnson*, 892 F.3d at 893 (*citing Payne*, 337 F.3d at 770). For purposes of a qualified immunity determination on summary judgment, this court must resolve inferences in Pryor's favor rather than resolve any disputes. *See Hurt*, 880 F.3d at 840.

The majority, however, asserts that this is a factual dispute that can be resolved on summary judgment because "the videos tell their own story." Majority Op. at 3. The majority cites *Scott* for the proposition that "when parties tell two different stories, 'one of which is blatantly contradicted by the record,' we 'should not adopt that version of the facts… .'" Majority Op. at 3 (*quoting Scott*, 550 U.S. at 380) (ellipsis in original).

As I alluded to above, the exception in *Scott* to the usual rules prohibiting fact finding on summary judgment, however, is a "narrow, pragmatic exception allowing appellants to contest the district court's determination that material facts are genuinely disputed," but only where the video "utterly discredit[s]" the non-movant's version of the facts. *Gant v. Hartman*, 924 F.3d 445, 449 (7th Cir. 2019). "Video evidence … can eviscerate a factual dispute only when the video is so definitive that there could be no reasonable disagreement about what the video depicts." *Kailin v. Vill. of Gurnee*, 77 F.4th 476, 481 (7th Cir. 2023) (*citing Scott*, 550 U.S. at 380). It cannot be used when it does not clearly and definitively resolve a material disputed fact. *Id.* at 482 (declining to apply the *Scott* exception when video does not clearly show the events in question); *Gupta*, 19 F.4th at 998 (reversing summary judgment where "reasonable jurors could certainly disagree about what [the video] reveals about the events of the night."); *Ferguson v. McDonough*, 13 F.4th 574, 581 (7th Cir. 2021) (explaining that

*Scott* does not apply where the video is open to multiple interpretation); *Jackson v. Curry*, 888 F.3d 259, 264 (7th Cir. 2018) (same).

As this court explained in *Gant*,

> *Scott* does not hold that courts should reject a plaintiff's account on summary judgment whenever documentary evidence, such as a video, offers some support for a governmental officer's version of events. Instead, *Scott* holds that where the trial court's determination that a fact is subject to reasonable dispute is blatantly and demonstrably false, a court of appeals may say so … .

*Id.* at 450 (internal citations omitted). Only in the rare case, however, will video evidence leave no room for interpretation by a fact finder. *Kailin*, 77 F.4th at 481.[3]

The line between the permissible and impermissible use of video evidence is therefore clear: video evidence can only be used when it "blatantly contradict[s]," or "utterly discredits" the non-movant's facts, or assures us beyond doubt that the non-movant's facts are "blatantly and demonstrably false." *Scott*, 550 U.S. at 380, *Gant*, 924 F.3d at 449–50. Was the light

---

[3] The majority states that the cases that I cite for the proposition that it is improper to rely on videos can be distinguished on their facts. Undoubtedly the clarity and content of videos will differ case-to-case, but here these cases are *only* cited for the pure legal proposition that courts cannot use video evidence to resolve disputed factual issues on summary judgment, unless no reasonable juror could watch the video and come to the opposite conclusion. For this proposition, factual differences in the video are irrelevant.

green or red? Did the car swerve over the double yellow line or not? Who threw the first punch? Did the defendant stop at a stop sign or not? *See, e.g. United States v. Norville*, 43 F.4th 680, 682 (7th Cir. 2022). These are all questions that can be resolved if both the video evidence and the inferences that can be drawn from it is clear and uncontroverted. Video evidence cannot resolve disputes where reasonable jurors could disagree about what the video reveals. *Gupta*, 19 F.4th at 998; *Ferguson*, 13 F.4th at 581; *Jackson*, 888 F.3d at 264. More importantly, in some cases, the actual events depicted in the video may be "plainly portrayed," as the majority states, but the interpretation of, and inferences from, that evidence still must be left to a jury. For example, a video may clearly show a defendant wrapping his two arms around another person. That act is plainly portrayed, but a jury may still have to interpret whether the video depicts a hug or a violent assault, and do so based on an interpretation of the evidence as a whole. This is what juries do; not judges on motions for summary judgment.

In this case the video evidence supports either interpretation of the facts—a reasonable juror could conclude either that Pryor's twelve steps constituted flight, or that he was positioning himself in front of a squad car to safely submit to the authority of the police. I do not see anything in the video that would make Pryor's version of the facts impossible or blatantly and demonstrably false as would be required for an application of *Scott.* I urge readers to watch the video in the district court record at R. 201, and ask themselves "can I definitively and unquestionably determine that Pryor was fleeing, or might he have been repositioning himself in front of the police dashcam and then submitting to their authority, or is there perhaps yet another interpretation of his movements?"

More importantly, readers should ask themselves, "could a reasonable juror, perhaps one with different experiences in the world than I have, disagree with what I think is happening in this video?"[4]

There is good reason to leave fact finding to a jury. By granting a motion for summary judgment we are barring non-moving parties from exercising an essential element of our adversarial court system. Trials allow parties to fully air competing inferences about video evidence by, among other things, cross examining witnesses, using closing arguments to frame video evidence in light of the surrounding circumstances, and by presenting expert testimony about the benefits and limitations of video evidence. As Gilbert and Sullivan said, "things are seldom as they seem," and video evidence often proves this adage. A trial gives parties the opportunity to explain why this might be so. For example, researchers have demonstrated that prior attitudes toward the police (as measured by survey questions) can predict what a viewers' conclusions will be about what they have seen on police body

---

[4] Although that video is available on the district court docket at R. 201, it is cumbersome for the public to access. A member of the public must first contact the Certified Copy Desk, wait for an invoice, pay the invoice, wait for the payment to be processed, and then wait for a URL via email. If, in fact, it becomes more common for district courts and appellate courts to decide cases based on video evidence, it will be imperative to have more easily available public access to those videos. A litigant ought to be able to argue to the court about the ways in which the videos in her particular case are similar to or different from the videos analyzed by courts in other cases. Moreover, a transparent court system requires the public to have easy access to the videos on which courts are relying in granting summary judgment.

camera footage. Seth W. Stoughton, *Police Body-Worn Cameras*, 96 N.C. L. Rev. 1363, 1407 (2018). A party might wish to submit other expert evidence about various biases inherent in video evidence itself. *See* Nora G. McNeil, *Perceptual and Cognitive Biases in the Uptake of Police Body-Worn Camera Footage: Implications and Suggestions for Introduction of Video Evidence at Trial*, 41 Quinnipiac L. Rev. 499, 504–538 (2023) (compiling research on various forms of perceptual and cognitive biases in police camera evidence including bias due to the point of view of the camera, camera angle, the prominence of people and objects in the visual field, speed and movement, how much detail the viewer must attend to, and distortions caused by wide-angle lenses.). It is a rare case indeed where the video evidence leaves no room for interpretation or qualification. *See Kailin*, 77 F.4th at 481.

Because the video evidence here can be subject to more than one interpretation, the court must apply the usual rules on summary judgment and take the facts in the light most favorable to Pryor—that is, that he was submitting to officers and not fleeing the scene of an arrest, particularly where no officers gave him any command not to move from his vehicle to the pursuing officer's police car. In that case, no reasonable officer could have believed an arrest for flight to be lawful.

3. *Probable cause for obstruction by refusing the order to get on the ground?*

Likewise, a jury should have been given the opportunity to determine whether Pryor was obstructing a police officer by not immediately complying with Officer Corrigan's order to "get on the ground." The relevant events for this inquiry

are described second-by-second in the footnote below.[5] But before turning to the factual question, it is helpful to explore

_____

[5] Isaak's dashcam video caught all of the video from the time Pryor walked in front of his vehicle and put up his hands until Officer Corrigan tackled him to the ground. The video submitted to the jury and contained in the record, however, contains no audio. (R. 202) Officer Corrigan's dashcam recording, on the other hand, contained both audio and video recordings, but for much of the time the video is obscured by Isaak's police vehicle. (R. 202) To coordinate the actions in the Isaak video with the sound in the Corrigan video, I synchronized the actions that were visible in both videos and charted each second. The results are in the chart below. From this chart I conclude that there were at most three to four seconds between the time that Officer Corrigan first yelled to Pryor to "get down" and when he began the leg sweep to tackle him.

| second | Corrigan dashcam | Isaak dashcam |
|---|---|---|
| 0 | 0:58 Pryor's left foot steps in front of Isaak's police vehicle | 0:52 Pryor's left foot steps in front of Isaak's police vehicle camera |
| 1 | 0:59 1st "get on the ground" | 0:53 Pryor shuffles in front of Isaak's police vehicle and faces the vehicle |
| 2 | 1:00 Corrigan runs toward Pryor | 0:54 Pryor raises his hand above his head |
| 3 | 1:01 2d "get on the ground" (no video of events) | 0:55 Pryor starts to lower his hands |
| 5 | 1:02 3d "get on the ground" (no video of events) | 0:56 Corrigan enters the frame and puts his hands on Pryor |
| 6 | 1:03 inaudible yelling (no video of events) | 0:57 Corrigan pushes Pryor into position |
| 7 | 1:04 Corrigan yells "down" (no video of events) | 0:58 start of Corrigan's leg sweep |
| 8 | 1:05 Pryor on way down | 0:59 Pryor on way down |
| 9 | 1:06 Pryor on the ground | 1:00 Pryor on the ground |

generally what it means to resist arrest or obstruct a police officer in Illinois. Under Illinois law, a citizen may not use force in resisting an arrest, regardless of whether the arrest in question is lawful or unlawful. 720 ILCS 5/7–7; *People v. Villarreal*, 604 N.E.2d 923, 926 (Ill. 1992). But non-physical resistance such as "[v]erbal resistance or argument alone, even the use of abusive language, is not a violation of the statute." *People v. Berardi*, 948 N.E.2d 98, 103 (Ill. App. Ct. 2011). The question for this case is what should a court make of Pryor's inaction, rather than his actions—that is, his failure to move when instructed? In *People v. Baskerville*, the Illinois Supreme Court sought to clarify the middle ground between mere argument and a physical act—conduct such as providing false information, refusing to disperse or leave a scene, advising suspects on how to escape arrest, or refusing to exit a vehicle. *Baskerville*, 2012 IL 111056, ¶¶ 22–25. The Illinois Supreme Court held that:

> Although a person may commit obstruction of a peace officer by means of a physical act, this type of conduct is neither an essential element of nor the exclusive means of committing an obstruction. The legislative focus of section 31–1(a) is on the tendency of the conduct to interpose an obstacle that impedes or hinders the officer in the performance of his authorized duties. *That inquiry is for the trier of fact, based upon the facts and circumstances of each case.*

*Id.* ¶ 23, 963 N.E.2d at 905 (emphasis mine). In other words, rather than focusing on action versus inaction, a court must focus instead on individual facts and discern whether, based on those circumstances, the defendant impeded the officer's

authorized act. *People v. Synnott*, 811 N.E.2d 236, 240 (Ill. App. Ct. 2004). Two Illinois Appellate Court cases demonstrate the importance of this individualized factual discernment. In *Synnott*, the appellate court found obstruction where the defendant refused to exit his vehicle but did so while holding firmly onto the steering wheel. *Synnott*, 811 N.E.2d at 238, 241. The appellate court in *Kotlinski*, distinguished *Synnott*, and opined that merely remaining stationary in the face of an order (in that particular case, a 21-second delay before complying with an order to get back in the car) would not constitute knowing and intentional obstruction. *Kotlinski*, 2011 IL App (2d) 101251, ¶¶ 47–48, 959 N.E.2d at 1240–41.

Any individualized assessment of whether an individual impeded an officer must focus on whether the suspect's action posed a *material* impediment to the officer's actions. *People v. Mehta*, 2020 IL App (3d) 180020, ¶ 26, 156 N.E.3d 608, 614. In other words, even though "an act might hinder or impede an official act in the technical sense, that hindrance or impediment may be so minimal as to not be considered a violation of" 720 ILCS 5/31-1. *Id.* ¶ 21, 156 N.E.3d at 613. Whether the defendant's conduct actually posed a material impediment to the administration of justice is a factual question. *Id.* ¶ 17, 29, 156 N.E.3d at 612, 614–15.

"[T]he length of any delay or the brevity of any impediment is a factor, if not the primary factor, in determining whether a given defendant has materially obstructed the actions of police." *Id.* ¶ 32, 156 N.E.3d at 615 . *See also, e.g., People v. Taylor*, 2012 IL App (2d) 110222, ¶ 17, 972 N.E.2d 753, 758-59 (ten-minute delay not a material impediment); *People v. Comage*, 946 N.E.2d 313, 319 (Ill. 2011) (20-second delay to look for dropped drugs did not constitute obstruction); *Berardi*, 948

N.E.2d at 103 (short encounter with verbal disagreement only did not constitute obstruction); *Kotlinski*, 2011 IL App (2d) 101251, ¶¶ 49–50, 959 N.E.2d at 1241–42 (no obstruction where defendant delayed getting back in the vehicle for 21 seconds after being ordered to do so). In this case, the video reveals that there were a mere 3-4 seconds between the time that Officer Corrigan first yelled "get on the ground" and when he began the process of tackling Pryor to the ground. In comparison to the cases above, such a short delay likely would not be a material impediment.

Officer safety is also a significant factor in determining whether a suspect has materially obstructed police activity. "[A]ny behavior that actually threatens an officer's safety or even places an officer in fear for his or her safety is a significant impediment to the officer's performance of his or her duties." *Synnott,* 811 N.E.3d at 228. And importantly, "obstructive acts that may not create a material impediment in one set of circumstances may nevertheless create such an impediment in other circumstances." *Mehta,* 2020 IL App (3d) 180020, ¶ 33, 156 N.E.3d at 615. "For example, actions that do not amount to material obstruction in a misdemeanor stop may nevertheless be considered a material impediment in a more fraught situation, such as the hot pursuit of a violent suspect." *Id.* ¶ 34, 156 N.E.3d at 616.

Officer Corrigan arrived to face a rapidly unfolding situation. The officers had received a tip that led them to believe the people in the van were involved in crack cocaine production.[6] The driver immediately took off running with Officer

---

[6] Of course, the tipster was incorrect. Officers found no drugs on Pryor, the others in the van, or anywhere in the areas near the scene that

(continued)

Isaak in pursuit. The majority and I agree that these circumstances would allow reasonable officers to use some amount of force to temporarily detain the passengers to ensure officer safety while the officers assessed whether they had probable cause to arrest. *See United States v. Olson*, 41 F.4th 792, 799 (7th Cir. 2022). I will discuss further the appropriateness of the use of force in a moment. I discuss it now only to make clear the important distinction between whether use of some force could have been a lawful part of a *Terry* stop to protect officer safety (if not excessive, it most certainly could) and whether, after securing their safety, the officers had probable cause to arrest Pryor for obstructing a police officer (I conclude they did not).

Returning to the question of probable cause for refusing the order to get on the ground, here too, the facts are contested, and the majority recognizes the dispute. The majority opinion acknowledges that "Pryor claims that he was not given time to get on the ground," but nevertheless later concludes that "Pryor refused Corrigan's order to 'get on the ground.'" *Id.* at 5, 12. Once again, the video evidence is open to inference and interpretation. The video would not preclude a reasonable jury from concluding that Pryor did not have time to get himself to the ground in the three seconds between the first commend to "get on the ground," and the leg sweep, or perhaps that he was lowering his hands in preparation to do so (most people need to use their hands to support themselves as they get face down on the ground without injuring themselves). Or a reasonable jury could look at the video and conclude that three seconds was sufficient for Pryor to

they searched, including with a drug sniffing dog. But for purposes of probable cause, we consider the knowledge the officers had at the time.

process the command and get to the ground. They might view the hand-lowering as more evidence of Pryor's failure to submit. Because the video is not definitive, a court must take the facts in the light most favorable to Pryor. I would conclude that, although Pryor could have conducted the leg sweep for his safety, given the Illinois law requiring material hindrance, no reasonable officer could conclude that he had probable cause to arrest Pryor for obstructing an officer for failing to get on the ground in the three seconds between when Pryor gave the order to "get on the ground" and when he began to take him down. *C.f. Brumitt v. Smith*, 102 F.4th 444, 448 (7th Cir. 2024) (assuming a police officer would need more than four seconds to register that he had knocked a suspect unconscious and then to stop applying force).

Of course, probable cause depends on the totality of the circumstances and cannot necessarily be evaluated by looking at each individual part of an event in isolation. *Wesby*, 583 U.S. at 60. In *Wesby*, the Supreme Court criticized the appellate panel majority for evaluating each of the facts one-by-one rather than considering the whole picture. *Id.* In *Wesby*, however, the Supreme Court spent six paragraphs detailing myriad facts of which the officers would have been aware that together supported a probable cause determination. *Wesby*, 583 U.S. at 57–60. In this case, the officers saw Pryor engage in two relevant actions—his twelve steps from the van to Officer Isaak's police vehicle, and his three-second delay getting to the ground. The other factor known to the officers at the time—that people in the van might be involved in the drug trade—supported Corrigan's need to secure the scene, but had no relevance to the obstruction charges. Once again, I emphasize that for purposes of probable cause, this court is not evaluating whether the officers, viewing the totality of the

circumstances, could have used reasonable force to secure the scene for their safety. They undoubtedly could. Instead, this court should be evaluating whether a reasonable officer, viewing the totality of the circumstances after the scene had been secured, could have concluded that he had probable cause to arrest Pryor for obstruction.

Although courts give police officers a wide berth for making probable cause determinations in the heat of the moment in rapidly changing chaotic situations (*Abbott*, 705 F.3d at 714), once Officer Corrigan subdued and handcuffed Pryor for his protection, he had plenty of time to determine whether he had probable cause to arrest him for committing the crime of obstruction of a police officer. *See, e.g.*, *Phillips v. Cmty. Ins. Corp.*, 678 F.3d 513, 526 (7th Cir. 2012) (explaining that once the scene has been secured, a court need no longer give officers the same benefit of the doubt for actions taken in tense, uncertain, and rapidly evolving situations).

In sum, given that the video evidence does not conclusively and definitively resolve whether Pryor was resisting arrest or obstructing a law enforcement officer, the district court should have allowed this determination to be made by a jury and should not have granted summary judgment in the officers' favor on these claims.

4. *Probable cause for resisting arrest during the handcuffing?*

Once the officers had the scene secured and Pryor in handcuffs could they have arrested him for resisting arrest during the handcuffing process? For much of this part of the video where Corrigan and Pryor are both on the ground, the action is obscured by Officer Corrigan's body and takes place rather far away. The video does not clearly portray, for instance,

whether Pryor is resisting or moving his face to get it off the icy pavement, whether he was attempting to place his hands behind his back or resisting Officer Corrigan's attempts to do so, whether it would have been anatomically possible for him to get his hands behind his back from certain positions, and whether he was applying force to his arms or not. Officer Corrigan tells him to "stop fighting," (Corrigan dashcam at 1:07, 1:13, 1:37), but Pryor, responds that he is "not fighting" and pointed out that he had submitted to the officers with his hands up. (Corrigan dashcam at 1:07, 1:37, 2:05, 3:02). The district court noted that "Pryor appeared to lay motionless as the officer continued to yell 'stop fighting' and 'don't move!'" R. 141 at 10; *Pryor v. Corrigan*, No. 17-CV-1968, 2021 WL 1192581, at *5 (N.D. Ill. Mar. 30, 2021) (citing Corrigan dashcam at 1:39-41). Neither Corrigan's nor Pryor's words provide definitive evidence of what was actually happening. Both knew they were being recorded, and their statements may have been performative rather than accurate descriptions of the actions of the other.[7] For all the reasons I describe above, the question of resistance during the handcuffing is a factual determination for a jury and cannot be resolved on summary judgment.

---

[7] *See* Ajay Sandhu, *Camera-Friendly Policing: How the Police Respond to Cameras and Photographers*, 14 Surveillance & Soc'y 78–89 (2016); Josiah Bates, *Bodycam Footage Hasn't Brought the Police Accountability Advocates Thought It Would,* Pulitzer Ctr., Dec. 12, 2023.

5. *Excessive force*[8]

As I noted above several times, the officers could use reasonable force to subdue Pryor during the *Terry* stop (or the arrest, if it became one) provided the force exercised was in proportion to the threat posed. *Phillips*, 678 F.3d at 519. "Our Fourth Amendment jurisprudence has long recognized that the right to make an … investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Graham v. Connor*, 490 U.S. 386, 396 (1989); *see also United States v. Lopez*, 907 F.3d 472, 478–79 (7th Cir. 2018) ("With the authority to stop comes the authority to require the subject to submit to the stop, and to use reasonable force to make him submit."). In the case of either an arrest or a *Terry* seizure, a court must evaluate whether the officer's actions were objectively reasonable in light of the totality of the facts and circumstances confronting that officer. *Graham*, 490 U.S. at 396. When considering the reasonableness of force in a *Terry* stop, a court must examine "whether the surrounding circumstances would support an officer's legitimate fear for personal safety. No two encounters are identical, so there is no litmus-paper test for determining when a seizure exceeds the bounds of an investigative stop and becomes an arrest," or when the force used in seizure becomes excessive. *Olson*, 41 F.4th at 799 (internal citations omitted). "And because of

---

[8] The leg sweep and tackle appear to be the only issues of excessive force remaining, as the district court allowed the question of excessive force on Officer Corrigan's punches to Pryor's head to go to a jury. Pryor does not raise any other excessive force claims. Pryor does assert that the district court erred when it cleaved the full arrest into parts—allowing the head strikes to go to a jury, but dismissing the tackle on summary judgment, but the majority has found no error, and I see no reason to address the issue in this concurrence/dissent.

this fact-intensive nature of the inquiry, we have noted that 'since the *Graham* reasonableness inquiry nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom, we have held on many occasions that summary judgment or judgment as a matter of law in excessive force cases should be granted sparingly." *Gupta*, 19 F.4th at 996 (*quoting Abdullahi v. City of Madison*, 423 F.3d 763, 773 (7th Cir. 2005)); *Siler v. City of Kenosha*, 957 F.3d 751, 759 (7th Cir. 2020) ("The obligation to consider the totality of the circumstances in these cases often makes resort to summary judgment inappropriate."). The majority does not explain why this case is so exceptional that it warrants skirting the usual assumption that a reasonableness inquiry requires a jury to sift through the facts.

As this court noted in *Gupta*, therefore, a court cannot determine whether an officer used greater force than was reasonably necessary until a fact finder resolves whether the officer needed to use force to effectuate the arrest. *Gupta*, 19 F.4th at 996. That assessment depends on, among other things, a determination of whether the suspect was, in fact obstructing or resisting arrest. And the evaluation of qualified immunity requires the same assessment of material fact— whether a reasonable officer could have concluded that Pryor was obstructing the officers or resisting arrest. Our caselaw provides officers plenty of notice that they cannot use significant force on a suspect who is not resisting. *Gupta*, 19 F.4th at 1001; *Miller v. Gonzalez*, 761 F.3d 822, 829 (7th Cir. 2014).[9] The

---

[9] The majority argues in footnote 8 that the facts in these two cases are not similar to those in the case before us. I cite these cases only for the legal proposition that police cannot use significant force on a non-resisting

(continued)

question of excessive force, therefore, requires a resolution of the disputed question of whether Pryor was resisting arrest at the time he was tackled, or whether he was submitting to the authority of the officers.

For these reasons, I would have reversed the district court's summary judgment decision which removed from the jury factual determinations that were the jury's to make. I concur with the majority's conclusions about the legality of the searches, the district court's rulings at trial, and in all other respects.

---

suspect. Comparing the facts of cases is only relevant to step two of a qualified immunity analysis—that is, in trying to determine whether a constitutional right was clearly established at the time. *Estate of Clark*, 865 F.3d at 550. The majority does not dispute, nor can it, that at the time of the events in question, a police officer would have been on notice that officers cannot use significant force on a suspect who is not resisting. *See Gupta*, 19 F.4th at 1001; *Miller*, 761 F.3d at 829. Because the video does not clearly indicate whether Pryor was resisting or not, this fact is for a jury to determine.