In the

# United States Court of Appeals
## For the Seventh Circuit

No. 22-1239

STEVEN KAILIN, *et al.*,

*Plaintiffs-Appellants*,

*v.*

VILLAGE OF GURNEE and DELANTE GREER,

*Defendants-Appellees*.

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:19-cv-05188 — **Sara L. Ellis**, *Judge*.

ARGUED DECEMBER 6, 2022 — DECIDED AUGUST 8, 2023

Before ROVNER, HAMILTON, and ST. EVE, *Circuit Judges*.

ROVNER, *Circuit Judge*. Steven and Kim Kailin called the
Village of Gurnee Police Department to report that their
daughter, Taylor, had been the victim of possible criminal
conduct. Officer Delante Greer arrived at their house around
8 p.m. on July 26, 2019, to follow up on the report. Six seconds
after Kim opened the door, Officer Greer shot the Kailins'
dog, Timber, on their neighbor's lawn. The Kailins sued Of-
ficer Greer and the Village of Gurnee, Illinois, naming

multiple theories of liability, but the only surviving claims in this court are the one for illegal seizure under 42 U.S.C. § 1983 against Officer Greer,[1] a claim of municipal liability under *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978), and a claim for indemnification by the Village.[2] The district court granted the defendants' joint motion for summary judgment.

Ordinarily we would begin our de novo review of a grant of a motion for summary judgment with a recitation of the facts viewed in the light most favorable to the non-movant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Smith v. Crounse Corp.*, 72 F. 4th 799, 804 (7th Cir. 2023). In this case, however, the lens through which the district court viewed the facts was influenced both by procedural processes and by summary judgment case law. Consequently, we will articulate the facts in more detail as we move through the procedural and summary judgment terrain.

---

[1] The killing of a pet constitutes a seizure within the meaning of the Fourth Amendment, and the use of deadly force against the pet is reasonable only if the pet poses an immediate danger and the use of force is unavoidable. *Viilo v. Eyre*, 547 F.3d 707, 710 (7th Cir. 2008).

[2] The plaintiffs-appellants' only discussion regarding indemnification is one sentence at the end of their brief which states, "Likewise, summary judgment on Plaintiffs' indemnification count must also be reversed where the unreasonable seizure and *Monell* claims are reversed." Plaintiffs-Appellants' Brief at 22. This argument likely has been waived, but in any event, it is not necessary to resolve the issue given our conclusions here. *Johnson v. Advoc. Health & Hosps. Corp.*, 892 F.3d 887, 898 (7th Cir. 2018) ("Arguments that consist of conclusory allegations that are not properly developed are waived.").

## A. The statement of undisputed material facts

The district court judge in this case, Judge Ellis, has procedural requirements regarding the submission of facts for summary judgment motions. She requires parties to confer and then "file a joint statement of undisputed material facts that the parties agree are not in dispute" separately from the memoranda of law. Defendants-Appellees' Short Appendix at 28 (emphasis omitted). Kailin argues that those procedures are inconsistent with Local Rule 56.1 of the Northern District of Illinois, and thus invalid. This court has previously reviewed Judge Ellis' requirement to file a joint motion of undisputed facts and found her required procedures to be consistent with both Federal Rule of Civil Procedure 56(a) and the Northern District of Illinois' Local Rule 56.1. *Chicago Studio Rental, Inc. v. Ill. Dep't of Com.*, 940 F.3d 971, 982 (7th Cir. 2019); *Sweatt v. Union Pac. RR. Co.*, 796 F.3d 701, 711–12 (7th Cir. 2015). Like the previous panels to consider the issue, we find no fault in those required processes. *See Sweatt*, 796 F.3d at 711–12.

Our conclusion still leaves us with a factual knot to disentangle. The district court's procedural requirement states that "the parties may not file—and the court will not consider—separate documents of undisputed facts." Defendants-Appellees' Short Appendix at 28–29. The other relevant portions of the court's procedural requirements are as follows:

> If the parties cannot agree whether proposed statements of fact are not in dispute, they may file a joint motion prior to filing the motion for summary judgment so the Court can determine whether there is a basis for the alleged disputes. … Parties should provide the Court with sufficient time to rule on factual disputes before

summary judgment motions are due. Failure to stipulate to an undisputed fact without a reasonable basis for doing so may result in the statement being admitted and/or the imposition of sanctions. …

If the non-moving party wholly refuses to join in the joint statement of undisputed material facts, the moving party will nevertheless be permitted to file the motion for summary judgment, accompanied by a separate declaration of counsel explaining why a joint statement of the undisputed facts was not filed.

**The Local Rules and the Court's procedures are not mere technicalities. Failure to abide by any of them, especially the joint statement requirement, will result in the Court striking briefs, disregarding statements of fact, deeming statements of facts admitted, denying summary judgment, and/or imposing sanctions.**

*Id.* (emphasis in original).

The defendants were the first to run up against (and thus to be reminded of) the district court's procedures, when they filed their summary judgment motion along with their own separate statement of material facts. The district court judge struck the filings for failing to comply with the court's procedures, and ordered the parties to meet and confer on a joint statement of facts as required by those procedures. She then set the due date for defendants' motion for summary judgment for Monday, August 9, 2021. Defendants' counsel sent a proposed "Joint Statement of Material Facts" to the Kailins'

counsel on July 15, 2021. Between July 15 and the due date for the statement, defendants' counsel sent many emails imploring the Kailins' counsel to respond to the proposed statement of material facts, all the while extending the requested response date and beseeching opposing counsel to respond quickly. On Thursday, August 5, defendants' counsel emailed plaintiffs' counsel to say that with the Monday deadline looming, and no response to date, "there is not enough time to present any points of disagreement to the Court. As such, I will be filing a statement of material facts and providing a separate declaration as to why we were unable to file a joint statement of material facts to the Court as outlined in Judge Ellis' standing orders." R. 79-6 at 3. At noon on Friday—one business day before the joint statement of material facts was due—the Kailins' counsel finally responded, inserting objections to most of the defendants' proposed facts. Defendants' counsel replied that the response had arrived too late for either negotiation or to bring the disputes before the judge, and consequently, she would be filing the defendants' statement of material facts with a declaration as described in the Thursday e-mail. This is, in fact, how the defendants proceeded.

Defendants' motion for summary judgment, however, mistakenly stated that "[t]o date, Plaintiffs' counsel has made no substantive response to Defendant's correspondence or its Joint Statement of Material Facts." R. 77 at 2. This was not true, as plaintiffs' counsel had indeed responded, but had done so just five hours before the close of business on the last business day before the joint statement was due. The simultaneously-filed declaration was more accurate and clear, stating, "I did not receive a substance [sic] response from Plaintiffs' counsel in time to properly negotiate the proposed Joint Statement of Material Facts in this matter and the *Kailin v*

*Metcalf* 19-cv-04703 matter."[3] R. 79 at 4. In the summary judgment reply brief, defendants' counsel stated that the language in the opening summary judgment brief had been an oversight as she was simultaneously filing a similar statement for the other case referenced in counsel's declaration. Defendants' counsel explained that she had intended to say, "To date, Plainttifs' counsel has made no **timely** substantive response to Defendants' correspondence or their Joint Statement of Material Facts." R. 86 at 2 (emphasis in original).

In the opinion and order granting the defendants' summary judgment motion, the district court commented on the joint statement hullabaloo as follows:

> The Court derives the facts set forth in this section from Defendants' Local Rule 56.1 Statement of Undisputed Material Facts. Steven, Kim, and Taylor failed to participate in the drafting of a joint statement of undisputed facts, as required by the Court's summary judgment procedures. Because the Court's procedures are not advisory and Steven, Kim, and Taylor failed to abide by them, the Court finds it appropriate to treat Defendants' facts as established. *See* N.D. Ill. LR 56.1(b)(3)(C) ("All material facts set forth in the statement required of the moving party will be deemed admitted unless controverted by the statement of the opposing party."); *Kreg Therapeutics, Inc. v. VitalGo, Inc.*,

---

[3] The Kailins had two unrelated matters against the Village pending before the same district court judge at the same time with the same filing deadlines. *See Kailin v. Metcalf*, 19-cv-04703 (N.D. Ill.).

> 919 F.3d 405, 411 (7th Cir. 2019) ("According to
> well-established Seventh Circuit law, that non-
> compliance [with the court's summary judg-
> ment procedures] meant that the district court
> could exercise its discretion to accept Kreg's
> statements of fact as undisputed."). As for Ste-
> ven, Kim, and Taylor's additional facts, the
> Court considers them to the extent they actually
> create a disputed fact and are appropriately pre-
> sented and supported, disregarding any state-
> ments that rely solely on hearsay evidence. The
> Court takes the facts in the light most favorable
> to Steven, Kim, and Taylor, the non-movants.

R. 88 at 2 n.2; D. Ct. Op. at 2 n.2.

It is not clear whether the district court missed the details
in the declaration and the correction in the reply brief, or
whether the judge considered plaintiffs' eleventh-hour re-
sponse to be the equivalent of a failure to participate. After
all, even if plaintiffs' counsel had overlooked the court's rule
or had any misunderstanding about it at the get-go, on July
12, after the defendants' gaffe, the court ordered both parties
"to meet and confer regarding the motion for summary judg-
ment and file a joint statement of facts." R. 74. The Kailins had
not met and conferred with the defendants at all, and cer-
tainly not with enough time to submit factual disputes to the
court before the deadline, as required by the court's proce-
dures. A district court would be well within reason to con-
strue plaintiffs' response submitted five hours before the close
of business the day before the due date as a violation of that
order and the court's procedures. We review a trial court's
decisions regarding strict compliance with local rules for an

abuse of discretion only. *Curtis v. Costco Wholesale Corp.*, 807 F.3d 215, 219 (7th Cir. 2015) (explaining that a district court has discretion to strictly enforce local rules, including by deeming a party's facts admitted); *Johnson v. Edward Orton, Jr. Ceramic Found.*, 71 F.4th 601, 611 n.13 (7th Cir. 2023) (same).

In the end, the district court judge did, at the least, take note of the Kailins' theory of the case, stating that the plaintiffs "argue that Timber never barked nor growled at Greer and cite to their testimony in which they testified that Timber was simply playing." R. 88 at 9; D. Ct. Op. at 9. But, as we discuss next, it did not matter which version of the facts the district court accepted, because the court concluded that the video from the body worn camera controlled and eliminated any dispute of fact.

## B. The role of the video evidence

The district court anchored its conclusion about the video evidence to the Supreme Court's message in *Scott v. Harris*, 550 U.S. 372 (2007), that facts need only be taken in the light most favorable to the nonmoving party where there is a "genuine" dispute as to those facts. *Id.* at 380. "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Id.* In the case of *Scott*, the Court found that a video showing the plaintiff driving erratically during a high-speed chase provided irrefutable evidence that the plaintiff posed an imminent threat to others. *Id.* at 380. Applying *Scott*, we have concluded that "a video record of the events at issue can evaporate any factual dispute that would otherwise exist." *United States v. Norville*, 43 F.4th 680, 682 (7th Cir. 2022). In light of

*Scott*, the district court determined that the footage the body worn camera governed the findings of fact in this case and that no reasonable jury could therefore believe the Kailins' version of events.

Video evidence, however, can eviscerate a factual dispute only when the video is so definitive that there could be no reasonable disagreement about what the video depicts. *Scott*, 550 U.S. at 380. It is a "narrow, pragmatic exception allowing appellants to contest the district court's determination that material facts are genuinely disputed," but only where the video "utterly discredit[s]" the non-movant's version of the facts. *Gant v. Hartman*, 924 F.3d 445, 449 (7th Cir. 2019). *Gant* further explained that

> *Scott* does not hold that courts should reject a plaintiff's account on summary judgment whenever documentary evidence, such as a video, offers some support for a governmental officer's version of events. Instead, *Scott* holds that where the trial court's determination that a fact is subject to reasonable dispute is blatantly and demonstrably false, a court of appeals may say so, even on interlocutory review.

*Id.* at 450 (internal citations omitted). It should be considered a rare case where video evidence leaves no room for interpretation by a fact finder. *Id.* (refusing to find that there was no material dispute of fact where the video did not provide irrefutable evidence of the movant's version of the facts); *see also Eagan v. Dempsey*, 987 F.3d 667, 692 n. 56 (7th Cir. 2021) (noting that the *Scott* exception is a narrow and pragmatic one reserved only in cases where there is clear and irrefutable video evidence); *Ferguson v. McDonough*, 13 F.4th 574, 581 (7th Cir.

2021) (declining to apply the *Scott* exception where the video was open to interpretation and did not utterly discredit the plaintiff's version of the facts); *Gupta v. Melloh*, 19 F.4th 990, 998 (7th Cir. 2021) (reversing a grant of summary judgment where reasonable jurors could have many different and opposing conclusions about what they saw in video evidence); *McCottrell v. White*, 933 F.3d 651, 661 n.9 (7th Cir. 2019) (declining to draw independent factual conclusions from a poor-quality, black and white video lacking audio).[4]

This is certainly not the rare case where the video definitively demonstrates what occurred. As a primary matter, there is no audio that could reveal whether Timber was growling or barking as Officer Greer alleged.[5] *See, e.g.*, *McCottrell*, 933 F.3d at 661 n.9; *Witt v. W. Va. State Police, Troop 2*, 633

---

[4] Moreover, the use of video evidence to discredit factual disputes at summary judgment should be rare because, as research has revealed, video images are seldom as unambiguous as they may appear. *See, e.g.*, Morgan A. Birck, *Do You See What I See? Problems with Juror Bias in Viewing Body-Camera Video Evidence*, 24 Mich. J. Race & L. 153, 164 (2018); Naomi Mezey, *The Image Cannot Speak for Itself: Film, Summary Judgment, and Visual Literacy*, 48 Val. U. L. Rev. 1, 17 (2013); Adam Benforado, *Frames of Injustice: The Bias We Overlook*, 85 Ind. L.J. 1333, 1334 (2010); David Kessler, *Justices in the Jury Box: Video Evidence and Summary Judgment in Scott v. Harris, 127 S. Ct. 1769 (2007)*, 31 Harv. J.L. & Pub. Pol'y 423, 434 (2008).

For an interesting interactive first-hand display of how body camera video can be ambiguous, see Timothy Williams, et. al., *Police Body Cameras: What Do You See?*" N.Y.Times, Updated Apr. 1, 2016. https://www.nytimes.com/interactive/2016/04/01/us/police-bodycam-video.html?action=click&module=RelatedCoverage&pgtype=Article&region=Footer (archived at https://perma.cc/XSA4-5E7V)

[5] Officer Greer was disciplined for failing to turn on the audio portion of his body camera as required. R. 83-4 at 16

F.3d 272, 277 (4th Cir. 2011) (finding that a soundless and poor-quality video does not clearly or blatantly contradict non-movant's version of the events). Moreover, the entire video of the critical event lasts a mere six seconds and it is disputable whether the dog can be seen at any time in the video until she has been shot. Kim Kailin begins to open the door when the time stamp on the video reads 20:02:13 (from this point forward, we will use only the seconds). At 14 seconds the door is open wide and it does not seem as if there is a dog visible in the frame. By 15 seconds, it is possible to see what might be the blurry image of a dog coming from the back part of the house, but it is difficult to tell, and a reasonable juror might see different things in that inkblot of a blur.[6] And because there is no audio during the critical portion of the video, a jury could not tell if Timber was barking or growling. Immediately, within that same second (at 15 seconds), Officer Greer turns and begins to run, and so, because the camera is mounted on his chest, the viewer can only see what is in front of him, which is the garden and the grass. There is no video of what the dog is doing, and, in fact, barring the possible blurry image of the dog in the back of the house for one second at the 15-second mark, there is no video of the dog at all until she has been shot and is on the ground at 19 seconds—6 seconds from when Kim first opened the door. Jurors

---

[6] The authoring judge of this opinion watched the video numerous times both in slow motion and stopping frame by frame, and the Judge's law clerk did the same while projected on a 65″ television screen and neither was able to determine if a dog was visible in the frame before Officer Greer turned and began running. Of course, such fact finding is not in an appellate court judge's province. *Icicle Seafoods, Inc. v. Worthington*, 475 U.S. 709, 713–14 (1986) (it is a mistake for appellate courts to engage in fact finding).

could interpret many things from what they see or do not see in those six seconds. The video does not show barking or growling; it does not show nipping or biting; it does not show the dog jumping on Officer Greer; it does not show Officer Greer's alleged attempt to use his taser; it does not even show the dog chasing Officer Greer.[7]

Without unambiguous video evidence, we are left with two conflicting versions of the facts. According to Officer Greer and the Village, Timber charged out to chase Officer Greer, barking and growling, and as she was running after Officer Greer she was nipping and attempting to bite him. The Kailins assert that their dog, who had no history of violence or aggression, merely ran after Officer Greer as any dog might do as part of play behavior once Officer Greer, due to his fear of dogs, took off running across the lawn.[8] According to their version of the facts, as soon as Officer Greer saw the dog in the house, he threw up his hands and said "oh shit, you have a dog" and then suddenly turned and ran through a flower bed in the Kailins' yard into the neighboring yard where he shot Timber. The Kailins also assert that had the Village

---

[7] The district court states, "the body worn camera also shows the actual chase." R. 88 at 11 (D. Ct. Op. at 11). Although it appears from the movement of the camera that Officer Greer is running, we do not see any part of the dog chasing the officer. Of course, a jury could interpret the video differently.

[8] Officer Greer testified at his deposition that he also shot and killed a dog on January 3, 2019, while serving a citation in Round Lake, Illinois. R. 83-5 at 8–9. Prior to that, while employed as an officer in North Chicago, Greer fired a warning shot from his service weapon into the ground to scare off a charging dog. *Id.* at 4–5.

offered proper training on interactions with dogs, Timber would not have been killed.

As we noted in *Gupta*,

> Where the material facts specifically averred by one party contradict the facts averred by a party moving for summary judgment, the motion must be denied. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990). A court's job on summary judgment is not to resolve swearing contests or decide which party's facts are more likely true. *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003). These credibility disputes are for fact finders to resolve. *Alexander v. Casino Queen, Inc.*, 739 F.3d 972, 982 (7th Cir. 2014).

*Gupta*, 19 F.4th at 996.

We hold therefore that it was error for the district court to conclude that the video left no room for interpretation by a fact finder. And without conclusive video evidence, we have before us a textbook case of disputed facts. In short, the video does nothing to blatantly contradict either side's story.

Resolution of the question of what Timber was doing and how she was behaving is key to determining the reasonableness of Officer Greer's actions and therefore not only liability on the Fourth Amendment claim, but also on the *Monell* and indemnification claims. As a result, these issues also cannot be resolved at this stage of the proceedings.

We therefore REVERSE and REMAND for further proceedings.