In the

# United States Court of Appeals
## For the Seventh Circuit

_____

No. 24-3293

CHRISTOPHER P. RADDANT,

*Plaintiff-Appellant,*

*v.*

DOUGLAS COUNTY, WISCONSIN, *et al.,*

*Defendants-Appellees.*

_____

Appeal from the United States District Court for the
Western District of Wisconsin.
No. 3:22-cv-00555-jdp — **James D. Peterson,** *Chief Judge.*

_____

ARGUED SEPTEMBER 22, 2025 — DECIDED MARCH 12, 2026

_____

Before EASTERBROOK, ROVNER, and ST. EVE, *Circuit Judges.*

ROVNER, *Circuit Judge.* Christopher Raddant sued several members of the Superior, Wisconsin police department and Douglas County, Wisconsin, alleging that the defendants violated his civil rights by using excessive force at the Douglas County jail as they searched him at the booking counter and then placed him into a receiving cell. A jury found in favor of the defendants on the one limited claim the district court allowed Raddant to present to a jury—a question regarding use

of force at the booking counter of the police station. For all the remaining issues, the district court granted the defendants' motion for summary judgment prior to trial. Now on appeal, with only the individual defendants remaining, Raddant challenges that grant of summary judgment and the district court's decision to exclude his experts at trial. We affirm.

**I.**

In the dark of night, Officer Griffith Coffman noticed a hastily parked vehicle with its windows open and expired registration. He did not see anyone exit the car but soon noticed Raddant wandering nearby. Their extended encounter and conversation ended with Coffman arresting Raddant for suspected bail violations.

Coffman's body-worn camera recorded all of his interactions with Raddant from their first encounter all the way through Raddant's processing at the local police station. For the bulk of the almost forty-five minutes that the camera recorded, Raddant went back and forth arguing with Coffman and then other officers at the police station.[1] By the time Raddant arrived at the station, he was on an upward incline of agitation. Coffman removed Raddant from the police vehicle and eventually escorted him into the main booking area of the station. In addition to Coffman's body camera, two other cameras in the booking area recorded the events—one from

---

[1] Coffman accused Raddant of drinking alcohol in violation of his bail conditions, and Raddant's behavior and speech seen in the video support the accusation. Raddant refused a breathalyzer test in the field, and the question of his intoxication is not presented in this case. There is nothing in the record about the training officers receive regarding engagement with intoxicated or otherwise antagonistic arrestees, but those questions loom large.

behind Raddant, and one from the front, although a counter in the booking area obstructed the front view of Raddant from the waist down. Once at the booking counter, defendant Officer Brett Larson began performing a pat-down search while defendant Officer Randi Libby assisted. Throughout the process, Raddant was agitated, complaining that he had an active MRSA infection on his wrist and that Coffman had removed his bandage. The defendants' fact section of the brief describes at length how Raddant yelled, swore, and refused to stop talking and arguing as instructed. But, of course, these verbal behaviors do not justify any use of force and thus are not helpful to a court's analysis of the propriety of such force. There is no doubt that the videos support a conclusion that Raddant appeared to be an obnoxious, loudmouthed, irritating arrestee who refused to stop arguing when instructed. Fourth Amendment law, however, assumes that police officers have thick skin, and does not tolerate force used out of frustration or impatience. Unlike loud mouthiness and obnoxiousness, on the other hand, physical resistance and threats to officer safety can justify the use of force, as do threats of future physical actions. And so, for example, when an officer at the booking desk asked Larson and Libby whether she should call for assistance, and Raddant responded "Yea, you better," the officers were entitled to take his threat of future resistance seriously and take action accordingly. R. 57-1 at 41:59-42:02. Likewise, the officers' assessment of the use of force may also have been altered by Raddant's statement that if the officers continued to twist his arm "we're going to have issues." R. 57-1 at 43:20-23. We focus, therefore, only on Raddant's acts of physical resistance or threats of such acts, as opposed to his refusal to follow

commands like "stop talking," or "be quiet," and other verbal annoyances.

Officers spent about eight minutes with Raddant at the booking desk while they attempted to search him for weapons and other contraband, during which time Raddant continued to argue with and exasperate the officers. Both parties agree, and the video confirms, that Officer Larson told Raddant, "you better stop or you are going to go to the floor, and you are not going to go down gently either." R. 57-1 at 42:07-42:10. Under Raddant's version of events, which we credit, he spent much of the time at the booking counter asking for medical help and to have the handcuffs loosened because they were hurting his wrists. The video confirms that he did make these requests. Under the defendants' version of events, Raddant was tensing his body and resisting the officers' attempts to search him. Tensing bodies are more difficult to discern in the video, but there is definite evidence that the officers were having difficulty completing their search. This factual dispute provides a backdrop, but is not itself directly relevant on appeal, as questions about use of force at the booking counter were resolved at trial or are otherwise not presented here. Eventually, all agree, and the video confirms, defendant-officers Thomas Johnston, David Phillips II, and Alan Clarke joined Larson and Libby in the effort to assist with an uncooperative arrestee. Libby informed Raddant that they would move him to a receiving cell to complete the search.

In the district court, Raddant alleged that Officers Libby, Larson, and Johnston "pulled Raddant backward by the handcuffs" and "dragged [Raddant] down the hallway." R. 67 at 3. The district court found that the video evidence contradicted Raddant's version of the events and instead

showed Raddant walking down the corridor with the officers walking behind him. The court concluded that the video "utterly discredit[ed] the non-movant's version of the facts." R. 77 at 13. Raddant does not appeal the district court's conclusion about being dragged down the hallway or include any details of the walk down the hallway. In his argument section, however, he presents a few paragraphs about the moments at the booking counter just before that walk down the hall—asserting that the officers first pulled Raddant backwards before turning him around. As we discuss below, if Raddant meant to include a claim about excessive force anywhere other than the receiving cell, it has been waived, and even if it has not been waived, the video evidence discredits his claim about force used as he was turned around from the booking desk.

After escorting Raddant down the hallway to the receiving cell, Officers Johnston, Larson, Phillips, and Clarke proceeded to walk Raddant toward a bed-shaped concrete slab in the receiving cell. Libby entered the cell a moment later.[2] Johnston placed a mattress onto the slab. According to Raddant's version of the facts, officers pushed him forward so that his left foot was on the mattress. Both parties agree that Clarke then lifted Raddant's right ankle at which point Raddant fell forward. And because his hands were cuffed behind his back, he was unable to break the fall onto his face. According to Raddant, as this was happening, Larson kicked the mattress out from under him so that Raddant's face hit the concrete slab and began to bleed. Officers called an ambulance to take Raddant to the hospital for treatment. Raddant alleges that as a result of the officers' use of force, he was treated for

---

[2] Another unidentified officer also accompanied the group but was not named in the suit.

post-traumatic stress disorder, a tear of the labrum in his left shoulder, a traumatic brain injury, and a nerve injury in his left wrist, requiring multiple surgeries.

Raddant filed suit pursuant to 42 U.S.C. § 1983 and Wisconsin state law, arguing that the defendants violated his Fourth Amendment rights by using excessive force and injuring him in the process. By the time the suit reached the district court on summary judgment, the claims had been honed to the federal excessive force claims against Clark, Johnston, Phillips, Larson, and Libby only. The district court organized Raddant's claims into three groups: "(1) force used in the booking area (handcuffs and arm twisting), (2) force used when moving Raddant from the booking area to the receiving cell ('dragging' him by the wrists), and (3) force used in the receiving cell (lifting up Raddant's leg and removing the mattress pad)." R. 77 at 8. The court allowed the following issues to go to the jury: whether Libby and Larson should have loosened or adjusted the handcuffs while Raddant was in the booking area, and whether Larson twisted Raddant's arm while Libby refused to intervene. The district court judge granted summary judgment in favor of the defendants on all other matters. The jury found in favor of the defendants on the fact issues that went to trial, and Raddant does not appeal that jury verdict.

According to Raddant, the issues on appeal are as follows: First, whether the district court erred by granting summary judgment on the claim that the officers used excessive force in the receiving cell, and second, whether the district court abused its discretion by excluding Raddant's experts.

## II.

### A. Excessive force cases involving pretrial detainees.

Raddant's suit accuses the officers of violating his Fourth Amendment rights, but it is not entirely clear whether Raddant's claim should have been brought pursuant to the Fourth or Fourteenth Amendment. In broad brush strokes, the Fourth Amendment generally applies to arrestees, while pretrial detainees find protection in the Due Process Clause of the Fourteenth Amendment. At the time of the alleged excessive force, Officer Coffman had concluded his arrest and turned Raddant over to jail personnel, and so Raddant was no longer technically an arrestee. At the same time, Raddant had not yet received a probable cause hearing. At least for some purposes—particularly in cases involving conditions of confinement and the provision of medical care—a detainee must proceed under the Fourth Amendment until a court has held a probable cause hearing mandated by *Gerstein v. Pugh*, 420 U.S. 103 (1975), and after such a hearing, the detainee must proceed under the Fourteenth Amendment. *Pulera v. Sarzant*, 966 F.3d 540, 549 (7th Cir. 2020). For claims of unlawful detention or malicious prosecution, on the other hand, the Supreme Court has held that "the Fourth Amendment governs a claim for unlawful pretrial detention even beyond the start of legal process." *Manuel v. City of Joliet, Ill.*, 580 U.S. 357, 369 (2017).

Here, of course, we are faced with a claim of excessive force, and not unlawful detention or conditions of confinement. Our sister circuits are not in agreement about whether, in excessive force cases, pretrial detainees who have not yet had a probable cause hearing must proceed under the Fourth or Fourteenth Amendment. *See Crocker v. Beatty*, 995 F.3d 1232, 1253–56 (11th Cir. 2021) (Newsome, J., concurring)

(noting that circuit courts disagree about where to draw the line between the applicability of the Fourth and Fourteenth Amendments in excessive force cases). In this circuit in such a situation, we held that a pretrial detainee who had not yet had a probable cause hearing was required to bring his excessive force claim under the Fourteenth Amendment. *Forrest v. Prine*, 620 F.3d 739, 743 (7th Cir. 2010). We have not, however, had much opportunity to explore further the line between the Fourth and Fourteenth Amendments in pretrial detainees who have not yet had a probable cause hearing.

Prior to the Supreme Court's ruling in *Kingsley v. Hendrickson*, 576 U.S. 389 (2015), the choice between the Fourth and Fourteenth Amendments mattered greatly, as we applied an objective standard under the Fourth Amendment to claims brought by arrestees, but applied the subjective components of an Eighth Amendment analysis to claims by pretrial detainees, requiring them to demonstrate that an officer had "an actual intent to violate the plaintiff's rights or reckless disregard for his rights." *Kingsley v. Hendrickson*, 744 F.3d 443, 451 (7th Cir. 2014), *vacated and remanded*, 576 U.S. 389 (2015) (citation modified). On certiorari, the Supreme Court disagreed with this circuit's application of the subjective criteria, holding that the "appropriate standard for a pretrial detainee's excessive force claim is solely an objective one. " *Kingsley*, 576 U.S. at 397. After *Kingsley*, a pretrial detainee need not demonstrate that officers were subjectively aware that their use of force was unreasonable; the pretrial detainee need "show only that the force purposely or knowingly used against him was objectively unreasonable." *Id.* at 396–97. This is the functional equivalent of the Fourth Amendment excessive-force inquiry elucidated in *Graham v. Connor*, which asks "whether the officers' actions are 'objectively reasonable' in light of the facts

and circumstances confronting them, without regard to their underlying intent or motivation." *Graham v. Connor*, 490 U.S. 396, 397 (1989). As the Supreme Court noted a few years after *Kingsley*, "[w]e need not address whether the Fourth or Fourteenth Amendment provides the proper basis for a claim of excessive force against a pretrial detainee [who has not yet had a probable cause hearing]. Whatever the source of law, in analyzing an excessive force claim, a court must determine whether the force was objectively unreasonable in light of the 'facts and circumstances of each particular case.'" *Lombardo v. City of St. Louis*, 594 U.S. 464, 467 n.2 (2021) (per curiam) (quoting *Kingsley*, 576 U.S. at 397 (quoting *Graham*, 490 U.S. at 396)). At the end of the day, we will look to both *Kingsley* and *Graham* as we evaluate whether the use of force here was objectively reasonable, with an emphasis on the *Kinglsey* factors as those are, at least semantically, a better fit for a pretrial detainee.

## B. The use of video evidence in summary judgment proceedings.

Before video cameras became a ubiquitous part of our landscape, courtroom factfinders were usually called upon to weigh the reliability and integrity of witnesses' recollections of events that occurred outside of the courtroom. And, of course, when evaluating a motion for summary judgment, courts are forbidden from weighing the facts and deciding whose version of events is more likely true. *Esco v. City of Chicago*, 107 F.4th 673, 679 (7th Cir. 2024). When considering a motion for summary judgment, we accept as true the material and plausible facts of which the opposing party has personal knowledge. *Id.* But what happens when the facts taken in the light most favorable to the party opposing summary

judgment are directly contradicted by video evidence that a court can view on its own? Must a court ignore the reality presented on video?

In *Scott v. Harris*, the Supreme Court answered this question in a case involving video evidence, instructing lower courts that "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris,* 550 U.S. 372, 380 (2007). This is not a new rule, but rather a more specific iteration of the concept that on summary judgment, courts need not accept facts that are so incredible or implausible that no reasonable fact finder could believe them. *See Payne v. Pauley*, 337 F.3d 767, 773 (7th Cir. 2003); *Hurt v. Wise*, 880 F.3d 831, 840 (7th Cir. 2018) (explaining how this rule applies to video evidence), *overruled on other grounds by Lewis v. City of Chicago*, 914 F.3d 472 (7th Cir. 2019).

The *Scott* holding, however, sets forth a definitively narrow exception to the general rule that courts do not weigh facts or make credibility determinations on summary judgment, allowing a court to disbelieve the non-movant's presentation of the facts only where the video "utterly discredit[s]" that rendition of the facts. *Kailin v. Vill. of Gurnee*, 77 F.4th 476, 481 (7th Cir. 2023) (quoting *Gant v. Hartman*, 924 F.3d 445, 449 (7th Cir. 2019)). Our decisions have been clear about the stringent limitations of the *Scott* holding. The *Scott* ruling "did not create a per se rule that video evidence is always subject to an appellate court's independent assessment." *Hurt*, 880 F.3d at 840. Moreover,

> *Scott* does not hold that courts should reject a plaintiff's account on summary judgment whenever documentary evidence, such as a video, offers some support for a governmental officer's version of events. Instead, *Scott* holds that where the trial court's determination that a fact is subject to reasonable dispute is blatantly and demonstrably false, a court of appeals may say so, even on interlocutory review.

*Gant*, 924 F.3d at 450 (internal quotations and citations omitted).

We have noted time and again that it is the "rare case where video evidence leaves no room for interpretation by a fact finder." *Kailin*, 77 F.4th at 481 (collecting cites); *see also Mendez v. City of Chicago*, 160 F.4th 888, 892 (7th Cir. 2025) (noting that videos that are "unclear, incomplete, and fairly open to varying interpretations cannot resolve evidentiary matters short of trial"). The actual portrayal of events in a video may be clear, but trials allow parties to air competing interpretations about video evidence by, among other things, cross examining witnesses, explaining the surrounding circumstances, and by presenting expert testimony about the limitations of video evidence. *See, e.g. United States v. Protho,* 41 F.4th 812, 822 (7th Cir. 2022) (noting that expert testimony on video interpretation can assist the jury in evaluating video evidence); *United States v. Dorsey*, 122 F.4th 850, 856 (9th Cir. 2024) (remarking that a detective's testimony about video evidence helped the jury by highlighting important details and helping jurors to discern those details correctly); *United States v. Roberts*, 84 F.4th 659, 670 (6th Cir. 2023) (explaining how trial court procedures can vet bias, authenticity, and

trustworthiness of videos); *United States v. Rosado-Perez*, 605 F.3d 48, 55 (1st Cir. 2010) (noting that expert testimony may help explain how video evidence fits into the conspiracy). Trials also create an opportunity for a party to present expert evidence about various biases inherent in video evidence itself. *See, e.g.*, Nora G. McNeil, *Perceptual and Cognitive Biases in the Uptake of Police Body-Worn Camera Footage: Implications and Suggestions for Introduction of Video Evidence at Trial*, 41 Quinnipiac L. Rev. 499, 504–538 (2023) (compiling research on various forms of perceptual and cognitive biases in police camera evidence). "Video can resolve a genuine dispute at summary judgment only if it offers 'irrefutable evidence' that 'utterly discredit[s]' countervailing factual assertions." *Pam v. City of Evansville*, 154 F.4th 523, 529 (7th Cir. 2025) (citing *Gant*, 924 F.3d at 450). This case, however, appears to fall into that narrow exception to the notion that video depictions of excessive force generally leave matters for jury interpretation.

## C. Video evidence in the receiving cell.

As we noted above, to succeed on a claim of excessive force under the Fourteenth Amendment, a pretrial detainee must demonstrate "that the force purposely or knowingly used against him was objectively unreasonable" based on the particular facts and circumstances of the events. *Kingsley*, 576 U.S. at 397. In doing so, a court must "also account for the 'legitimate interests that stem from [the government's] need to manage the facility in which the individual is detained,' appropriately deferring to 'policies and practices that in th[e] judgment' of jail officials 'are needed to preserve internal order and discipline and to maintain institutional security.'" *Id.* (quoting *Bell v. Wolfish*, 441 U.S. 520, 540, 547 (1979)). In the pretrial detainee context, the *Kingsley* Court suggested that

courts look at, among other things, "the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting." *Kingsley*, 576 U.S. at 397. In *Graham*, the Court suggested that in considering the reasonableness of force under a Fourth Amendment claim, a court might consider "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396. While weighing these factors, a court must make allowances for the fact that officers must often make split-second decisions in chaotic and rapidly-evolving circumstances, and do not have the benefit of hindsight that a court has upon later review. *Id.* at 397.

Bearing these factors in mind, we look to the events that occurred in the receiving cell that night. We begin with Raddant's account before moving to the video evidence. According to Raddant, he was not resisting "or was, at most, passively resisting." Raddant Brief at 13; *see also* R. 68 at 1. Raddant argues that Libby made the decision to have the other officers take Raddant to the ground in the cell but his citations to the record do not offer any support for that claim. Raddant next asserts that Clarke lifted Raddant's right ankle to destabilize him, causing him to fall forward onto his face while Larson intentionally kicked the mattress out from under Raddant so that Raddant's head would make direct contact with the unpadded concrete. According to Raddant, the video depicts his knees bending rather than locking as he leans forward over the bunk—indicating that he is not pushing back against

the officers. Raddant argues that a reasonable jury could interpret the video to show that Raddant was not actively resisting but rather struggling to keep his balance as four officers were pushing him onto a concrete bunk with a slippery mattress. Raddant argues, in the alternative, that even if he were passively resisting, the officers used more force than necessary to secure a passively resisting arrestee. As Raddant argues, because he was "[n]ot resisting, or at most, passively resisting, while handcuffed, in a secure location, and surrounded by at least five officers, clearly established law shows that it was objectively unreasonable for the officers to push him forward by lifting his ankle to make him fall face first onto a concrete bunk." Raddant Brief at 16.

But the video does not leave any viable material issues for a jury to consider. What we see is not the use of excessive force, but an unfortunate accident at best, or clumsiness, at worst. Could all of this have been avoided by lowering Raddant's agitation rather than ramping it up by engaging with his cacophonic complaints? Possibly. But excessive force cases are not opportunities for courts to opine on judges' interpretations of what police officers might have done better or differently. Our only role is to assess whether the force purposely or knowingly used against Raddant was objectively unreasonable from the standpoint of a reasonable officer's best assessment of the situation at hand. *Kingsley*, 576 U.S. at 397.

The video taken from the receiving cell begins with the officers trying to round the corner from the short hallway between the booking desk and the receiving room. In the video, the officers are clearly having trouble maneuvering Raddant into the room. This is, in part, because he has extended one

foot in front of him as a brake. R. 51-2 at 00:01. He resists being turned into the room and the officers struggle to maneuver him despite the fact that Johnston is holding him by his right arm and Larson is holding him by his left arm. (Larson has to step back as they reach the door as all three men will not fit through the doorway together.) As they arrive at the threshold of the room, the officers are walking behind Raddant and pushing on his back to move him forward. Immediately upon entering the receiving cell, Raddant places his right foot on the bed/slab. R. 51-2 at 00:06. He then steps up with his left leg so that he is standing on the slab. At this point Johnston reaches over to flip the mattress, which is propped up against the wall, onto the slab. R. 51-2 at 00:07. Because Raddant's feet are already on the slab, as the mattress comes down, Raddant has to lift his feet to put them on top of the mattress, rather than have them underneath. To do so, he takes a large extended step forward with his left foot—almost approaching a split position—one that, as it turns out, is quite unstable. R. 51-2 at 00:09. As he begins to put his right knee down, the force of his left foot begins to push the mattress under and then behind him. R. 51-2 at 00:11. Although it is not entirely clear when Clarke grabs Raddant's leg, by thirteen seconds into the video, Clarke is holding Raddant's right leg, his left leg is slipping backwards toward him and he is, consequently, falling forward. As he begins to tumble, the force of his body moving forward causes his legs to push the mattress entirely off of the slab. R. 51-2 at 00:12-00:13. As the mattress slips backward toward Larson, the weight of Raddant's body falling pulls Larson forward and onto the mattress. R. 51-2 at 00:14. Raddant argues that Larson kicked the mattress out from under him, but the only evidence he has to support that contention is the same video that the district court viewed.

The district court found that the video left no room for a jury to conclude that Larson kicked the mattress out from under Raddant. And because Larson was behind Raddant, Raddant could not have any personal knowledge of Larson's actions. We agree with the district court's assessment of the video during these seconds.

Raddant raises several legitimate points based on the *Graham* and *Kinglsey* factors that suggest that the situation did not call for a strong show of force. Raddant was in a relatively safe place—a police station. He was not standing by the side of a road or surrounded by an agitated crowd. He was secured with handcuffs and encircled by five officers, and thus posed a small, but non-negligible immediate risk to officers. *But see, e.g., United States v. Burke*, 425 F.3d 400, 406 (7th Cir. 2005) (recounting episode where pretrial detainee being transported within a federal courthouse used a secreted handcuff key to escape and subsequently kill a U.S. Marshal and a court security officer). The crime for which Raddant had been arrested was fairly minor—a violation of his conditions of release. On the other hand, the video does clearly show him resisting as he enters the receiving cell. And ironically, it may have been his own desperate calls to have his handcuffs removed from his infected wrists that increased the urgency to complete the search and move him to the receiving cell. Prisoners who have not been searched pose risks both to officers and themselves. *See id.*; *see also Del Raine v. Williford*, 32 F.3d 1024, 1042 (7th Cir. 1994) (discussing the guile with which prisoners have secreted dangerous objects and contraband). Because Raddant was handcuffed and seemingly intoxicated, leaving him alone would have also risked injury. *See, e.g., Gupta v. Melloh*, 19 F.4th 990, 999 (7th Cir. 2021). And once again, courts are not in the position to evaluate whether police officers and jail

guards make the best choices about de-escalation, timing, and moving prisoners. Our only role is to evaluate whether they violate the Constitution by using excessive force. The situation did not call for a strong use of force, but the video confirms that the use of force was also not large. And even if Raddant was merely trying to maintain his balance rather than resisting, as he claims, the officers reasonably interpreted his actions as resisting. The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make decisions about how much force to use with little time to reflect and often without the full knowledge that a birds-eye view from video might provide. *See Graham*, 490 U.S. at 396–97. Sometimes it will be clear only in hindsight that they miscalculated. The video confirms that the officers' use of some amount of force to corral an uncooperative (or unbalanced) prisoner led to an unfortunate accident and injury. And although upon reflection or with more time for planning they might have made choices that would have avoided injury, that is not the standard we apply.

It is true that the video is a bit grainy—especially compared to the high-definition video to which we have grown accustomed of late. But the acts are nonetheless sufficiently clear. This is not a situation such as we encountered in *Gupta*, where the audio-less video showed only the top of the arrestee's head for most of the time. *Gupta*, 19 F.4th at 998. Nor is it like *Kailin* in which the officer's bodycam did not catch any audio or video of the dog that the officer alleged was attacking him. *Kailin*, 77 F.4th at 482. Here we can see the full action in the receiving cell and the video leaves nothing for a jury to decide—Raddant resisted or the officers reasonably interpreted his actions as resistance. And in the course of countering that resistance and moving him onto the bunk, Raddant

slid as the slippery mattress pushed out from under him, causing his fall. The officers certainly did not do all they could have to de-escalate Raddant's agitation, but their force was not excessive in light of the circumstances known to them.

That takes us to Raddant's single page argument that "The Bodycam Video does show Raddant being pulled backwards away from the booking counter, which was a continuation of the excessive force." Raddant Brief at 20; *see also* Reply Brief at 3–4. Raddant's statement of issues and summary of argument in his briefs informs the court that he appeals only the district court's conclusions about the video evidence regarding the events occurring in the receiving cell. Despite this, Raddant's two paragraph argument appears to assert that the court erred when it granted summary judgment based on events that occurred at the booking desk before the officers led him down the hallway. Raddant states that the officers' act of pulling Raddant backward from the booking counter "was a continuation of the officers refusing to adjust Raddant's handcuffs and manipulating his arms despite his repeated complaints about the extreme pain he was experiencing." Raddant Brief at 20. Although the argument is not entirely clear, it seems that Raddant is arguing that the district court should have sent this separate issue to the jury—that is, whether the officers used excessive force while turning Raddant around at the booking counter, as opposed to in the hallway or the receiving cell. Raddant failed to identify this in his statement of issues or summary of argument. We might forgive this procedural gaffe but for the fact that the argument itself is so cursory and unclear and does not appear to have been raised before the district court. All of it, we must therefore surmise, amounts to waiver.

But even if the argument has not been waived, we can determine from watching all three relevant videos in slow motion that no reasonable juror could conclude that the officers used excessive force while turning Raddant around from the booking desk before walking him down the hall. R. 129-B, ex. 24 at 7:55-7:58; R. 129-B, ex. 23 at 7:51-7:54; R. 57-1 at 44:45-44:48. Raddant was not cooperating with the officers and the officers needed to move him to a cell to complete their search. The three videos from three different angles show the three seconds in which the officers are turning Raddant around and removing him from the booking area. From those we can see that Libby is holding Raddant by the upper arm and Larson is holding Raddant by the forearm. *Id.* Neither officer is grabbing Raddant by the wrist or handcuffs. *Id.* Just as Libby yells "Go," Johnston puts his hand on Raddant's shoulder and starts to pull him back and turn him around. R. 57-1 at 44:44-46. It is clear that most of the force of the turn comes from Johnston's grasp on Raddant's shoulder. *Id.* In fact, Libby lets go of Raddant's arm almost immediately. R. 129-B, ex. 24 at 7:56. We see only very minor force used to turn Raddant around. In sum, there are no material fact disputes about excessive force that warrant trial.

### D. Exclusion of the expert witnesses.

Prior to the limited trial, the district court granted defendants Libby and Larson's motion in limine to exclude testimony from all five of Raddant's expert witnesses. Through those witnesses, Raddant sought first to demonstrate that the actions of the officers at the jail caused certain injuries to his wrists and shoulders, and second, to catalogue the extent of those injuries. The issue at trial was limited to questions of liability on the part of Larson and Libby for refusing to adjust

Raddant's handcuffs after he was arrested, Larson's liability for twisting Raddant's arm while he was in handcuffs, and Libby's liability for failing to intervene. Raddant does not challenge the jury's verdict on appeal, however, and therefore the issue of whether the district court abused its discretion when it excluded his expert evidence from the trial is moot. There are no remaining appellate issues regarding liability or damages for the acts Larson and Libby took in refusing to loosen Raddant's handcuffs or twisting his arm and therefore there are no remaining appealable issues regarding the expert testimony. *See, e.g., Murray v. Chicago Transit Auth.*, 252 F.3d 880, 890 (7th Cir. 2001).

Because the district court properly granted summary judgment on the reasonableness of the use of force and any questions about the exclusion of expert testimony are moot, we AFFIRM the district court opinion on all matters.